UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jose Antunes,

          Plaintiff,                 **DEMAND FOR JURY TRIAL**

                                      Case No.  20-_____

vs.                                   Hon.

Gerdau MacSteel, Inc.,
a Delaware corporation,
and Gerdau Ameristeel US, Inc.,
a Florida corporation,
and Rodrigo Belloc, jointly
and severally,

          Defendants.
_____

**GASIOREK, MORGAN, GRECO,
McCAULEY& KOTZIAN, P.C.**
BY:  RAY CAREY (P33266)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
Rcarey@gmgmklaw.com

_____

**COMPLAINT AND JURY DEMAND**

     Plaintiff Jose Antunes, by and through his attorneys, GASIOREK,

MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., complains against Defendants,

Gerdau MacSteel, Inc., Gerdau Ameristeel US, Inc., and Rodrigo Belloc ("collectively "Defendants), as follows:

1.      This is an action for civil conspiracy and for employment discrimination and interference in violation of 42 U.S.C. §1981 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCLA §§ 37.2101, *et seq*.; violation of Michigan public policy; breach of an express or implied employment contract; and tortious interference with employment, employment contract, and advantageous business relationship all arising out of Plaintiff's employment relationship with Defendants and Gerdau S.A.

## PARTIES

2.      Plaintiff Jose Antunes (hereinafter "Plaintiff" or "Mr. Antunes") resides in the City of Dexter, in Washtenaw County, State of Michigan, within the Eastern District of Michigan.

3.      Defendant Gerdau MacSteel, Inc. (hereinafter "MacSteel" or "Defendant Gerdau MacSteel"), is incorporated in the State of Delaware and maintains its headquarters at 4221 W. Boy Scout Blvd., Ste. 600., Tampa, Florida 33607, but it also has offices and a place of business at 5591 Morrill Road, Jackson, Michigan 49201, and other locations within the Eastern District of Michigan.

2

4.     Defendant Gerdau Ameristeel US, Inc. (hereinafter "Ameristeel" or "Defendant Gerdau Ameristeel"), is incorporated in the State of Florida and maintains its headquarters at 4221 W. Boy Scout Blvd., Ste. 600.,Tampa, Florida 33607, but it also has offices and a place of business at 5591 Morrill Road, Jackson, Michigan 49201, and other locations within the Eastern District of Michigan.

5.     Defendant Rodrigo Belloc (hereinafter "Defendant Belloc" or "Mr. Belloc") is a citizen of Brazil with a temporary residence within the Eastern District of Michigan.

6.     Plaintiff was at all relevant times co-employed by Gerdau S.A. ("Gerdau"), Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel, most recently as Defendant Gerdau MacSteel's Accounting Manager until his employment was abruptly terminated on and effective, December 6, 2019.

## JURISDICTION AND VENUE

7.     The amount in controversy exceeds $75,000 exclusive of interest and costs.

8.     This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1332 (diversity jurisdiction), and 28 U.S.C.§1343 (civil rights).

9.     There is diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a permanent resident of Michigan; Defendant Gerdau MacSteel and Defendant Gerdau Ameristeel are incorporated in states other than Michigan and have their corporate headquarters and offices in Florida; and Defendant Belloc is a citizen of Brazil with a temporary residence in either Florida or Michigan.

10.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's state law claims for ELCRA violations and common law claims for violation of Michigan public policy, breach of express or implied contract, and tortious interference with employment, employment contract, and advantageous business relationship.

11.     This Court has personal jurisdiction over Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel because each company maintains offices and facilities and engages in regular and systematic business and other activities within the Eastern District of Michigan and the acts attributed to Defendants that give rise to Plaintiff's claims occurred within the Eastern District of Michigan.

12.     This Court has personal jurisdiction over Defendant Belloc because he maintains a temporary residence and the acts attributed to Defendants that give rise to Plaintiff's claims occurred within the Eastern District of Michigan.

4

13.     Venue is proper in this district court pursuant 28 U.S.C. §1391(b) and (c) because Plaintiff resides and Defendants are located within the Eastern District of Michigan and the events that give rise to Plaintiffs' claims occurred within the Eastern District of Michigan.

14.     Venue also is convenient in this judicial district.

## BACKGROUND FACTS

15.     Mr. Antunes was born on August 4, 1968, is a 51-year-old male citizen of Brazil, and is a person of Brazilian ancestry and national origin.

16.     Mr. Antunes is married to his long-time wife, Andreia, who is a citizen of Brazil and a person of Brazilian ancestry and national origin, and they have two minor children, one child who was born in Brazil and is a citizen of Brazil and another child who was born in the U.S.

17.     Mr. Antunes is a highly educated finance, audit, and accounting executive with over 25 years of experience working in these fields of expertise.

18.     Gerdau S.A. is a more than 100-year-old Brazilian steel company and purports to be the leading producing of long steel in North and South America and one of the major suppliers of specialty long steel throughout the world.

19.     Gerdau has its headquarters in Brazil, but it owns operating companies in at least 14 other countries, including the United States.

20.    Gerdau markets its products to the construction, metal-mechanical, automotive, heavy truck, agricultural, and other industrial sectors throughout the world.

21.    Gerdau's products in their diverse forms are an integral part of the structures of homes, commercial structures and office buildings, shopping centers, hospitals, bridges, manufacturing, assembly and hydroelectric plants; these are incorporated into power and telephone lines; and these are raw material for automotive and truck parts and construction and agricultural equipment.

22.    Defendant Gerdau MacSteel and Defendant Gerdau Ameristeel (collectively "Defendants") are wholly owned U.S. subsidiaries of Gerdau.

23.    Gerdau was the majority owner of MacSteel Monroe, Inc., d/b/a Gerdau Special Steel North America, which merged into Defendant Gerdau MacSteel, effective December 31, 2015.

24.    Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel are part of the special steel business operations of Gerdau.

25.    Defendant Gerdau MacSteel is an engineered steel bar producer with has an office in Jackson, Michigan, and operates steel mills in Jackson and Monroe, Michigan; and Fort Smith, Arkansas; and metal processing facilities in Huntington, Indiana.

26.    Mr. Antunes commenced his employment with Gerdau at its corporate offices in Brazil in November, 2003, as a Technical Advisor after working as an auditor for Price Waterhouse Coopers since June, 1991.

27.    As Mr. Antunes employer, Gerdau was required under the Labour and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Mr. Antunes and his family which included, but were not limited to: annual salary, health, and other benefits; funding of Brazilian social security benefits at the rate of between 8 and 11% of Mr. Antunes's total annual compensation; funding of a guaranteed severance fund ("FGTS") for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; 30 days plus 3 additional days per year of service   prior notice of employment termination without cause or pay in lieu of requisite notice; and upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement.

28. These were deemed to be contractual terms and conditions of Mr. Antunes's employment with Gerdau whether or not incorporated into a written employment contract as a matter of Brazilian law.

29. As a technical Advisor for Gerdau, Mr. Antunes was responsible for and more than satisfactorily performed duties with respect to preparation of financial statements in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Accounting Principles in Brazil ("BR GAAP") and preparation of consolidated financial statements for review by Gerdau leadership and in accordance with U.S. and Brazilian security and exchange commission ("SEC") reporting standards.

30. Mr. Antunes more than satisfactorily performed these various accounting, financial reporting and financial compliance functions for Gerdau until on or about November 1, 2006, when Gerdau transferred him as an expatriate to Defendant Gerdau Ameristeel in Tampa, Florida, as a Senior Corporate Accountant.

31. Gerdau and Defendant Gerdau Ameristeel initially arranged for Mr. Antunes to obtain an L-1A nonimmigrant employment visa from the U.S. Citizenship and Immigrations Services ("USCIS") within the U.S. Department of Homeland Security authorizing him to work for Gerdau and Defendant Gerdau Ameristeel in the U.S.

8

32. The L-1A nonimmigrant visa classification enables a U.S. employer like Defendant Gerdau Ameristeel to facilitate the transfer of an executive or manager from a foreign parent company like Gerdau to temporarily work in the U.S. for a 3-year period that may extended for a total period not to exceed 7 years.

33. As a Senior Corporate Accountant at Defendant Gerdau Ameristeel, Mr. Antunes was co-employed by Gerdau and Defendant Gerdau Ameristeel and he was responsible for and more than satisfactorily performed duties with respect to preparation of financial statements in accordance with GAAP, BR GAAP, and international financial reporting standards ("IFRS"); reporting financial and managerial information internally to Defendant Gerdau Ameristeel and to Gerdau leadership; preparation of monthly financial closing and reporting statements, routine financial journal entries, standard financial accruals, and financial allocations and statistics for Defendant Gerdau Ameristeel financial accounting and operational purposes; preparation of consolidated financial statements for review by Gerdau leadership and in accordance with SEC reporting standards; and coordination of audit operations and preparation of audit schedules for outside auditors.

34. As co-employers of Mr. Antunes, Gerdau and Defendant Gerdau Ameristeel were required under the Labour and other laws of Brazil to provide

certain types of compensation and other benefits for the benefit of Mr. Antunes and his family which included, but were not limited to: annual salary, health, and other benefits; continued funding of Brazilian social security benefits at the rate of between 8 and 11% of Mr. Antunes's total annual compensation; continued funding of the FGTS guaranteed severance fund for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; 30 days plus 3 additional days per year of service prior notice of employment termination without cause or pay in lieu of requisite notice; upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement; housing subsidies; rental car allowances; moving allowances and/or transport of household goods to and from Brazil; round trip airfare, hotel and other housing and related expenses for Mr. Antunes and his family; airfare, moving expenses, and housing expenses upon return of Mr. Antunes and his family to Brazil; income tax assistance; and other benefits.

35.     These were deemed to be contractual terms and conditions of Mr. Antunes co-employment with Gerdau and Defendant Gerdau Ameristeel whether or not incorporated into a written employment contract as a matter of Brazilian law.

36.     Mr. Antunes more than satisfactorily performed his various accounting, financial reporting and financial compliance functions for Gerdau and Defendant Gerdau Ameristeel until on or about June 1, 2008, when Gerdau and Gerdau Ameristeel transferred him as an expatriate to Defendant Gerdau MacSteel in Jackson, Michigan, initially as its Financial Planning Manager and later as its Accounting Manager.

37.     Mr. Antunes received and accepted a May 7, 2008 written offer with respect to his MacSteel position, which provided that "Your employment may be terminated by either you or Gerdau MacSteel at any time," but the offer did not specify and Mr. Antunes did not sign an acknowledgment that he was employed "at will" at MacSteel.

38.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel arranged for Mr. Antunes to obtain an H-1B nonimmigrant employment visa and for renewals of this type of visa from the USCIS during the period between June, 2009, and January, 2014, while Mr. Antunes was employed at Defendant Gerdau MacSteel.

11

39.     The H-1B visa is a non-immigrant employment visa that allows U.S. companies like Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel to temporarily employ foreign workers in specialty occupations that require theoretical or technical expertise in specialized fields such as in information technology, finance, accounting, architecture, engineering, mathematics, science, medicine, and other professional fields.

40.     An H-1B visa is usually granted for a 3-year period and can be extended for an additional 3-year period potentially allowing the foreign worker to remain employed in the U.S. for a maximum of 6 years.

41.     On August 12, 2009, Mr. Jim Scriven, Defendant Gerdau's MacSteel's Vice President of Human Resources, notified USCIS that MacSteel had offered Mr. Antunes employment as its Financial Planning Manager for a period not to exceed 36 months to support its applications for an H-1B visa for Mr. Antunes.

42.     Mr. Antunes legitimately expected that his employment could be terminated only for just cause during the 36 month period based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, including Mr. Scriven,  to the DOL and USCIS in support of his H-1B visa petition and the language of Gerdau's Ethical Guidelines that he was required to acknowledge as terms and conditions of his

employment, which provide that a failure to adhere to the guidelines was grounds for disciplinary action up to, and including, termination of his employment.

43.     Mr. Antunes legitimately expected that his employment could be terminated for unsatisfactory job performance or just cause and only after prior application of progressive discipline or corrective action based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, including Mr. Scriven,  to the DOL and USCIS and the human resources practices and procedures of Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

44.     As Defendant Gerdau MacSteel's Financial Planning Manager and later as its Accounting Manager, Mr. Antunes was co-employed by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and he was responsible for and more than satisfactorily performed duties with respect to: preparation of financial statements in accordance with GAAP,BR GAAP, and IFRS; reporting financial and managerial information internally to Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Gerdau leadership; preparation of monthly financial closing and reporting statements, routine financial journal entries, standard financial accruals, and financial allocations and statistics for Defendant MacSteel financial accounting and operational

purposes; preparation of consolidated financial statements for review by Gerdau leadership and in accordance with SEC reporting standards; coordination of audit operations and preparation of audit schedules for outside auditors; development and implementation of auditing, accounting, and financial reporting policies, practices and procedures, internal controls, and financial strategies to maintain the competitive positions of Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel; coordination of internal and external audits of Defendant Gerdau MacSteel and its various mills and other operations; serving as the key liaison between the MacSteel operations and finance functions; consolidated financial and other management reporting to the Gerdau corporate team in Brazil; consolidated financial and other management reporting to Defendant Gerdau Ameristeel's finance and other management;  supervision of and collaboration with MacSteel mill controllers, accountants, and finance team; training and evaluation of Defendant Gerdau MacSteel accounting staff; and identification and remediation of adverse auditing, accounting, and financial issues arising within MacSteel mills and other operational units, among other duties.

45.     During his employment at Defendant MacSteel, Mr. Antunes was responsible for creation of its credit department, assumed responsibility for credit department, accounts receivable and payable, and payroll issues, and

worked with Gerdau compliance representatives to develop and implement operational policies, practices and procedures for the credit department and accounts payable and payroll functions.

46. As co-employers of Mr. Antunes, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel were required under the Labour and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Mr. Antunes and his family which included, but were not limited to: annual salary, health, and other benefits; continued funding of Brazilian social security benefits at the rate of between 8 and 11% of Mr. Antunes's total annual compensation; continued funding of the FGTS guaranteed severance fund for the benefit of Mr. Antunes at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement; housing subsidies; rental car allowances; moving allowances and/or transport of household goods to and from Brazil; round trip airfare, hotel and other housing and related

15

expenses for Mr. Antunes and his family; airfare, moving expenses, and housing expenses upon return of Mr. Antunes and his family to Brazil; income tax assistance; and other benefits.

47.    These were deemed to be contractual terms and conditions of Mr. Antunes's co-employment with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel whether or not incorporated into a written employment contract as a matter of Brazilian law.

48.    Mr. Antunes initially reported to the MacSteel Vice President Group Controller as MacSteel's Financial Planning Manager and later reported to the President of MacSteel as MacSteel's Financial Planning Manager and later as its Accounting Manager.

49.    Mr. Antunes received performance evaluations throughout the period of his employment in these roles, including the last evaluation that he received from MacSteel's then President for its 2018 fiscal year, evincing that he consistently met expectations for his position.

50.    Although Mr. Antunes received performance evaluations throughout his MacSteel employment evincing that he consistently met expectations for his positions, he was paid less than a female who is a U.S. citizen and employed by Defendant Gerdau MacSteel as a plant controller at its Monroe plant although the work that he performed was at least equal to the

16

work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

51.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel arranged for renewal of Mr. Antunes H-1B visa during the period between June, 2009, and January, 2014.

52.     However, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives had decided after Mr. Antunes's transfer to MacSteel in June, 2008, and while they were arranging for him to obtain an H-1B visa that he should obtain and commenced the process for him to obtain a Permanent Resident Card or Green Card due to the limited duration of the H-1B visa so that Mr. Antunes could work on an indefinite basis in the U.S. for Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel initially as Defendant Gerdau MacSteel's Financial Planning Manager and later as its Accounting Manager.

53.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives arranged for submission of the requisite ETA Form 9089 to the U.S. Department of Labor ("DOL), which was required for Mr. Antunes to obtain approval for a Green Card.

54.     An employer's submission of the ETA Form 9089 to the DOL allows it to seek what is known as "permanent labor certification" for a prospective employee.

55.     In conjunction with this process, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives were required to obtain a prevailing wage determination ("PWD" )from the DOL with respect to Mr. Antunes's job, to demonstrate that they had initiated a careful process of advertising and recruiting for this job, and to have made a determination that there were not any qualified U.S. workers willing and available to perform the job.

56.     In conjunction with this process, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel initially represented to Mr. Antunes, the DOL, and the USCIS that they intended to employ Mr. Antunes on a permanent basis in the U.S. as Defendant Gerdau MacSteel's Financial Planning Manager.

57.     In conjunction with this process, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel later represented to Mr. Antunes, the DOL, and the USCIS that they intended to employ Mr. Antunes on a

permanent basis in the U.S. as Defendant Gerdau MacSteel's Accounting Manager.

58.   The DOL issued a permanent labor certification in response to information supplied and representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives with respect to Mr. Antunes's position.

59.   This allowed Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives to arrange for concurrent submission of a petition to the USCIS on Form I-140 seeking a determination that Mr. Antunes be approved to work on a permanent basis in the U.S. for Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and that his application for a Green Card be approved.

60.   Mr. Antunes legitimately expected that his employment with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel would continue until either he chose to terminate his employment or unless his employment were terminated for violation of Gerdau's Code of Ethics or other grounds constituting just cause for this action based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, including Mr. Scriven, to the DOL and USCIS in

support of his H-1B visa petition and Green Card application and the language of Gerdau's Ethical Guidelines that he was required to acknowledge as terms and conditions of his employment.

61.    Plaintiff legitimately expected that his employment with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel could be terminated only for unsatisfactory job performance or just cause and only after prior application of progressive discipline or corrective action based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, including Mr. Scriven,  to the DOL and USCIS in support of his H-1B visa petition and Green Card application and the human resources practices and procedures of Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

62.    Mr. Antunes agreed to the concurrent submission of a petition to the USCIS seeking a determination that Mr. Antunes be approved work on a permanent basis in the U.S. for Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel as Defendant Gerdau MacSteel's Accounting Manager and that his application for a Green Card be approved based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives to the DOL and USCIS in support of his H-1B visa petition and Green Card application and legitimate expectation that his

employment would continue until either he chose to terminate his employment or unless his employment were to be terminated for violation of Gerdau's Code of Ethics or other grounds constituting or just cause for this action.

63.     The USCIS granted the petition and issued a Green Card to Mr. Antunes, effective January 1, 2014, based on the representations made by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives to the DOL and USCIS.

64.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives' decision that Mr. Antunes should obtain and the arrangements they made for Mr. Antunes to obtain a Green Card actually occurred in conjunction with an illegal, malicious, and wrongful conspiracy among them and as a pretext to ostensibly, unilaterally terminate Mr. Antunes's express or implied employment contract and co-employer relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel once his status changed to Brazilian expatriate with U.S. Green Card status.

65.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives' decision that Mr. Antunes should obtain and the arrangements they made for Mr. Antunes to obtain a Green Card actually occurred in conjunction with an illegal, malicious, and wrongful conspiracy among them by which they purportedly would terminate Mr. Antunes's Gerdau

employment relationship and seek to avoid ongoing obligations of Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel to Mr. Antunes and his family under the Labour and other laws of Brazil.

66. Mr. Antunes was notified that this was intended by Defendant MacSteel Human Resources representative, Tom Taborek, and Gerdau representative, Cintia Borges Hartmann Lazzaris, among other Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, between the Fall, 2013, and late February or mid-March, 2014.

67. Mr. Antunes complained to Mr. Taborek and Gerdau representative, Cintia Borges Hartmann Lazzaris, among other Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives, about this then contemplated action and requested that the status quo be maintained, but they declined to accede to his request.

68. Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives effectuated the purported unilateral termination Mr. Antunes's co-employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and Gerdau purported to permanently transfer Mr. Antunes to Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel, effective April 1, 2014.

69. This occurred ostensibly because Mr. Antunes's U.S. work authorization status changed from one as a Brazilian expatriate Gerdau employee with a non-immigrant employment L-1A or H-1B visa to one with Green Card status, in breach of Mr. Antunes' express or implied employment contract with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel Gerdau, and in violation of the Labour and other laws of Brazil, which provide that those aspects of Brazilian law that are more favorable to a Brazilian expatriate employee than the laws of the foreign county where he works continue to apply to the Brazilian expatriate employee.

70. Mr. Antunes told Mr. Mark Marccuci, Defendant Gerdau MacSteel's former President, during his 2018 performance review with Mr. Marccuci, that he believed that the job description and compensation for his position as Accounting Manager should be enhanced because these did not account for all the duties and responsibilities that he was performing.

71. Mr. Marccuci acknowledged that there should be adjustments to Mr. Antunes's job description and compensation to account for the duties and responsibilities that he was performing, but he never implemented any of these changes.

72.     Defendant Gerdau MacSteel, Defendant Gerdau Ameristeel, and Gerdau ignored and otherwise failed to appropriately address and respond to Mr. Antunes's legitimate concerns about his compensation and the unilateral, purported termination of Mr. Antunes's express or implied employment contract and employment relationship with Gerdau.

73.     Instead, Gerdeau replaced Mr. Marccuci with Rodrigo Belloc as President of MacSteel in June or July, 2019, and Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Mr. Belloc and the Gerdau MacSteel Human Resources Director, Andre Rodrigues, conspired to terminate Mr. Antunes employment because they intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

74.     Between the Summer and November, 2019, Mr. Antunes like certain other MacSteel employees was offered the opportunity to voluntarily terminate his MacSteel employment in consideration for certain severance benefits that the Company offered ("voluntary buy-out offer").

75.     Mr. Antunes declined to accept the voluntary buy-out offer.

76.     As a result, Messrs. Belloc and Rodrigues conspired with other Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel representatives and initiated a scheme to involuntarily terminate Mr. Antunes's

24

employment without cause, because of his age, alienage, national origin, race, gender, Green Card status, and other protected characteristics and because they intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

77. Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, decided in accordance with this conspiracy to post and purportedly implement a selection process for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified.

78. Messrs. Belloc and Rodrigues interviewed Mr. Antunes in late November, 2019, under the pretext that he was being given fair consideration for the position; thereafter notified him that they deemed him unqualified for the position although Mr. Antunes's was not only amply qualified for it, he also was the most qualified candidate for the position, and they did not articulate how or why he was deemed unqualified for the position; and Mr. Belloc told Mr. Antunes that his job was not in jeopardy after Mr. Antunes asked if he was going to "fire" him or otherwise terminate his employment.

79. Upon information and belief, Messrs. Belloc and Rodrigues interviewed other MacSteel employees during the Fall 2019, under the pretext

that they also were being given fair consideration for the position and thereafter notified them that they were deemed unqualified for the position.

80. The interview process for the MacSteel Controller or Operations Strategic Controller position was a sham and Mr. Antunes was not selected for the position because these actions occurred in conjunction with an illegal, malicious, and wrongful conspiracy among Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, to terminate Mr. Antunes's employment without cause and for pretextual reasons because they already had selected a younger, less qualified Brazilian who was to be transferred from Gerdau to MacSteel for the position and as a replacement for Mr. Antunes.

81. The interview process for the MacSteel Controller or Operations Strategic Controller position and subsequent advertisements and recruitment for the position were shams and Mr. Antunes was not selected for the position because these actions occurred in conjunction with an illegal, malicious, and wrongful conspiracy among Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, to falsely certify to the DOL and USCIS that they had initiated a careful process of advertising and recruiting for the position and made a

determination that there were not any qualified U.S. workers willing and available to perform the job.

82.   Mr. Antunes was not given any notice of job performance deficiencies for which he was culpable, warning of any kind about his job performance, or subjected to discipline of any kind, another performance evaluation, or a correction action or performance improvement plan of any kind at any time throughout his Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

83.   Neither Mr. Antunes nor anyone else in the departments he managed received notice at any time before December 6, 2019, that MacSteel intended to eliminate Mr. Antunes's job or any other jobs within the departments managed by him.

84.   On December 6, 2019, a week or two after Mr. Antunes was interviewed for the MacSteel Controller or Operations Strategic Controller position, Messrs. Belloc and Rodrigues met with Mr. Antunes and abruptly told him that his co-employment with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel was terminated ostensibly because his job had been eliminated, effective December 6, 2019, and they did not provide him with other Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities.

85.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, falsely stated that Mr. Antunes's job had been eliminated in accordance with the conspiracy among them  although Mr. Belloc previously told Mr. Antunes that his job was not in jeopardy, the duties and responsibilities of his position had not been eliminated, these needed to be performed, and MacSteel already had selected a younger Brazilian expatriate who was to be transferred from Gerdau to replace Mr. Antunes in either his former position, the one he was denied although he amply qualified, or another position different in title only.

86.     Job elimination does not constitute a termination of employment for "cause" as defined in the Brazilian Labour laws and statutes.

87.     Despite this, Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did not offer to pay to Mr. Antunes and did not pay to him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Mr. Antunes upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for  airfare, moving expenses, and housing expenses

28

to enable Mr. Antunes and his family to move back to Brazil; among other benefits.

88. Instead, Messrs. Belloc and Rodrigues provided Mr. Antunes with a copy of a proposed Separation Agreement and Full and Final Release of Claims (severance agreement).

89. The proposed severance agreement included an offer of 16 weeks of base pay, payment of the amount that Defendant Gerdau MacSteel would have contributed toward the costs of medical, prescription, dental and vision benefits that Mr. Antunes had with the Company for the 16 week period, and the Short term Incentive payment that he should have earned but for the wrongful, discriminatory and retaliatory termination of his employment as consideration for Mr. Antunes's execution of the proposed severance agreement and release of all claims that arise out of Mr. Antunes's employment and employment relationships with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

90. Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did not enhance his compensation to account for his actual duties and responsibilities; did not select Mr. Antunes for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr.

Antunes's was amply qualified; terminated Mr. Antunes's employment; did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and attempted to coerce him into signing the proposed severance agreement because of his national origin, alienage, age, race, and gender.

91.    Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, treated Mr. Antunes differently than similarly situated non-Caucasian, non-Brazilian, younger, and female employees and employees who are U.S. citizens who have consistently meets expectations or worse job evaluations when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; when they terminated Mr. Antunes's employment; when they did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and when they attempted to coerce him into signing the proposed severance agreement.

92.    Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did

not enhance Mr. Antunes's compensation to account for his actual duties and responsibilities; did not select him for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; terminated Mr. Antunes's employment; did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and attempted to coerce him into signing the proposed severance agreement to deprive him of equal pay and to avoid their obligations to him under the Labour Laws of Brazil.

93.    Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did not enhance Mr. Antunes's compensation to account for his actual duties and responsibilities; did not select Mr. Antunes for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; terminated Mr. Antunes's employment; did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and attempted to coerce him into signing the proposed severance agreement in breach of Mr. Antunes's express or implied employment contract and co-employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

94.     Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and their representatives, including Messrs. Belloc and Rodrigues, did not enhance Mr. Antunes's compensation to account for his actual duties and responsibilities; did not select Mr. Antunes for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; terminated Mr. Antunes's employment; did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and attempted to coerce him into signing the proposed severance agreement in a disingenuous and illegal attempt to avoid their contractual and legal obligations to Mr. Antunes to: pay him annual salary, bonus and incentive compensation and to maintain his health care, retirement and other benefits until he chooses to voluntarily terminate or retire from his Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel co-employment relationship; tender amounts to him equivalent to Brazilian social security benefits due to him; tender amounts to him equivalent to FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Mr. Antunes upon termination of his employment; tender 78 days of pay to him in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; and

32

compensate him for  airfare, moving, housing, relocation, and other expenses that will be incurred to move with his family back to Brazil, among other benefits.

95.     Defendants' purported reasons for the failure to enhance Mr. Antunes's compensation to account for his actual duties and responsibilities; refusal to select Mr. Antunes for the position of MacSteel Controller or Operations Strategic Controller; the termination of Mr. Antunes's employment; and the refusal to provide him with other comparable Gerdau job opportunities are not true and are a pre-text for discrimination against him on account of his national origin, alienage, race, age, and gender, for violation of Michigan public policy, and for breach of and interference with Mr. Antunes's express or implied employment contract and co-employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

96.     As a consequence of the wrongful, discriminatory, and retaliatory termination of Mr. Antunes's co-employment with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel, Mr. Antunes and his family have effectively been forced to live in exile in the U.S.  with no source of income and with limited if any comparable job opportunities available to Mr. Antunes due to language limitations and other barriers to comparable re-employment.

## COUNT I
### *Breach of Employment Contract/Wrongful Discharge*

97.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

98.     At all times relevant, Plaintiff was co-employed by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel in accordance with an express or implied employment agreement which provided that his employment would continue until either he chose to terminate his employment or unless his employment were terminated for violation of Gerdau's Code of Ethics or other grounds constituting just cause for this action.

99.     At all times relevant, Plaintiff was co-employed by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel in accordance with an express or implied employment agreement which provided that his employment could be terminated only for unsatisfactory job performance or just cause and only after prior application of progressive discipline or corrective action.

100.     At all times relevant, Plaintiff was co-employed by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel in accordance with an express or implied employment agreement under which these companies were required by the terms of the agreement and under the Labour

and other laws of Brazil to provide certain types of compensation and other benefits for the benefit of Plaintiff and his family which included, but were not limited to: annual salary, health, and other benefits; continued funding of Brazilian social security benefits at the rate of between 8 and 11% of Plaintiff's total annual compensation; continued funding of the FGTS guaranteed severance fund  for the benefit of Plaintiff at a rate equal to no less than 8% of his total annual compensation; 30 days of paid vacation after each 12 months of work plus a 1/3 bonus; 13th month of salary based on his full annual compensation; upon termination of his employment by Gerdau, the amount that accumulated or should have accumulated in the FGTS fund since he commenced employment with Gerdau 2003, plus an amount equal to 40% of his FGTS fund, if the termination of his employment is not for "cause" as defined in the statutes pertaining to FGTS entitlement; housing subsidies; rental car allowances; moving allowances and/or transport of household goods to and from Brazil; round trip airfare, hotel and other housing and related expenses for Plaintiff and his family; airfare, moving expenses, and housing expenses upon return of Plaintiff and his family to Brazil; income tax assistance; and other benefits.

101.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, initially breached their express or implied employment agreement with

Plaintiff in   April 2014, when they purported to terminate Plaintiff's employment relationship with Gerdau without cause in an attempt to avoid their ongoing legal and contractual obligations to Plaintiff and his family under the Labour and other laws of Brazil.

102.  Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel breached their express or implied employment agreement with Plaintiff when they denied him the position of MacSteel Controller or Operations Strategic Controller, a position for which he was amply qualified; terminated Plaintiff's employment without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause ; and attempted to coerce him into signing the proposed severance agreement because they intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

103.  Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel breached their express or implied employment agreement with Plaintiff when they terminated Plaintiff's employment without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause ;  attempted to coerce him into signing the proposed severance agreement; and denied him:  amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits

due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for  airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

104.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

**COUNT II**
***Discrimination Based on Alienage in Violation of 42 U.S.C. § 1981***

105.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

106.   At all times relevant, Plaintiff was an employee and Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc were his employers covered by and within the meaning of 42 U.S.C. § 1981.

107    At all times relevant, despite his alien status, Plaintiff had the same right to make and enforce his express or implied employment agreement with Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel and to enjoyment of all benefits, privileges, terms, and conditions of his contractual and employment relationship with Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel as is enjoyed by white citizens of the U.S.

108.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his alienage and depriving Plaintiff of his rights under 42 U.S.C. §1981 to enforce his express or implied employment agreement with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

109.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his

alienage and depriving Plaintiff of his rights under 42 U.S.C. §1981 when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; when they terminated Mr. Antunes's employment; when they did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and when they attempted to coerce him into signing the proposed severance agreement.

110.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his alienage and depriving Plaintiff of his rights under 42 U.S.C. §1981 when they paid him less than a female plant controller who was a U.S. citizen although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

111.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally,

maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his alienage and depriving Plaintiff of his rights under 42 U.S.C. §1981 when they denied him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

112. The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities because he was not a white citizen of the U.S.

113. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety,

humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT III
### *Conspiracy to Engage in and National Origin/Alienage Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act*

114. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

115. At all times relevant, Plaintiff was an employee and Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc each was his employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act("ELCRA"), M.C.L.A. §§ 37.2101, *et seq.*

116. At all times relevant, Defendants had a duty under the ELCRA not to discriminate against Plaintiff because of his national origin and alienage.

117. Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and alienage and depriving Plaintiff of his rights under the

ELCRA to make and enforce his express or implied employment agreement with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

118.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and alienage and depriving Plaintiff of his rights under the ELCRA when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; when they terminated Mr. Antunes's employment; when they did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and when they attempted to coerce him into signing the proposed severance agreement.

119.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and alienage and depriving Plaintiff of his rights under the

ELCRA  when they paid him less than a female plant controller who was a U.S. citizen although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

120.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his national origin and alienage and depriving Plaintiff of his rights under the ELCRA when they denied him:  amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

121.    The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's

rights and sensibilities because of his Brazilian nation origin and he was not a citizen of the U.S.

122.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT IV
### *Conspiracy to Engage in and Age Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act*

123.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

124.    At all times relevant, Plaintiff was an employee and Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel each was his employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act("ELCRA"), M.C.L.A. §§ 37.2101, *et seq.*

125.    At all times relevant, Defendants had a duty under the ELCRA not to discriminate against Plaintiff because of his age.

126.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ELCRA to make and enforce his express or implied employment agreement with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

127.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ELCRA when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Controller or Operations Strategic Controller, a position for which Mr. Antunes's was amply qualified; when they terminated Mr. Antunes's employment; when they did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and

Defendant Gerdau MacSteel job opportunities; and when they attempted to coerce him into signing the proposed severance agreement.

128. Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ELCRA when they paid him less than a younger female plant controller although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

129. Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his age and depriving Plaintiff of his rights under the ELCRA when they denied him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment

termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

130.    The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities.

131.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

### COUNT V
### *Conspiracy to Engage in and Sex Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act*

132.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

47

133.    At all times relevant, Plaintiff was an employee and Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel each was his employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act("ELCRA"), M.C.L.A. §§ 37.2101, *et seq.*

134.    At all times relevant, Defendants had a duty under the ELCRA not to discriminate against Plaintiff because of his sex.

135.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under the ELCRA to make and enforce his express or implied employment agreement with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

136.    Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under the ELCRA when they did not enhance his compensation to account for his actual duties and responsibilities; when they did not select him for the position of MacSteel Controller or Operations

48

Strategic Controller, a position for which Mr. Antunes's was amply qualified; when they terminated Mr. Antunes's employment; when they did not provide him with other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities; and when they attempted to coerce him into signing the proposed severance agreement.

137.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under the ELCRA  when they paid him less than a younger female plant controller although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

138.   Gerdau, Defendant Gerdau Ameristeel, Defendant Gerdau MacSteel, and Defendant Belloc individually and through their representatives illegally, maliciously, and wrongfully conspired with each other with the intent to and for the illegal purpose of discriminating against Plaintiff on account of his sex and depriving Plaintiff of his rights under the ELCRA when they denied him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund

49

benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

139.    The discriminatory practices at issue were intentional and willful and were committed with malice or with reckless indifference to Plaintiff's rights and sensibilities.

140.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT VI
## VIOLATION OF THEEQUAL PAY ACT OF 1963

141.  Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter reiterated paragraph by paragraph.

142.  At all times relevant, Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel were each an "employer" of and "employ[ed") Plaintiff as these terms are defined by section 203(d) and (g) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq. See* 29 U.S.C. §203 (d) and (g).

143.  At all times relevant, Defendant Gerdau Ameristeel and Defendant Gerdau MacSteel were each an "enterprise" as this term is defined by section 203(r) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq. See* 29 U.S.C. §203 (r).

144.  At all times relevant, Plaintiff was an "employee" of Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel as this term is defined by section 203(e) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq. See* 29 U.S.C. §203 (e).

145.  The Equal Pay Act of 1963 ("EPA), 29 U.S.C. §206(d) is an amendment to the Fair Labor Standards Act and prohibits "employer[s] ... [from] discriminat[ing] ... on the basis of sex by paying wages to employees [...]

at a rate less than the rate [paid] to employees of the opposite sex [...] for equal work on jobs [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"

146.   Defendants violated Plaintiff's rights under the EPA by:

a. Paying Plaintiff less than a female plant controller employed by Defendant Gerdau MacSteel although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions; and

b. Terminating Plaintiff's employment because of his sex and to avoid paying him compensation and granting him benefits equal to what the female plant controller received and is continuing to receive although the work that he performed was at least equal to the work she performed, her job required no more skill, effort, and responsibility than those associated with his job, and their jobs were performed under similar working conditions.

147.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary

pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT VII
### *Tortious Interference with An Employment Contract*

148.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

149.    Plaintiff was co-employed by Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel in accordance with an express or implied employment contract as described in Count I.

150.    Defendant Belloc was personally aware of and familiar with Plaintiff's employment contract with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel and knew that Plaintiff enjoyed a favorable employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

151.    Defendant Belloc knew that Plaintiff had reason to be confident that his favorable employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel would continue indefinitely and at least until he chose to voluntarily terminate employment with or retire from Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel employment.

152.   Defendant Belloc knew that Plaintiff annually earned a substantial salary and bonus and received health care, retirement, and other fringe benefits from Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel because of his favorable employment relationship with them.

153.   Defendant Belloc knew that Plaintiff was eligible for substantial additional benefits under the Labour laws of Brazil because of his favorable employment relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

154.   Defendant Belloc intentionally and tortiously interfered with Plaintiff's employment contract with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel when he denied Plaintiff the position of MacSteel Controller or Operations Strategic Controller, a position for which he was amply qualified; terminated Plaintiff's employment without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause ; and attempted to coerce him into signing the proposed severance agreement because he intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

155. Defendant Belloc intentionally and tortiously interfered with Plaintiff's employment contract with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel when he terminated Plaintiff's employment

without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause; attempted to coerce him into signing the proposed severance agreement; and denied him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

156.   As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

**COUNT VIII**
*Tortious   Interference   with   Advantageous   Business
Relationship and Expectancy*

157.   Plaintiff realleges and incorporates by reference the allegations set

forth in the preceding paragraphs as if reiterated paragraph by paragraph.

158.   Plaintiff was employed by Gerdau, Defendant Gerdau Ameristeel,

and Defendant Gerdau MacSteel in accordance with an express or implied

employment contract as described in Count I.

159.   Defendant Belloc was personally aware of and familiar with

Plaintiff's employment contract with Gerdau, Defendant Gerdau Ameristeel,

and Defendant Gerdau MacSteel and knew that Plaintiff enjoyed an

advantageous employment and business relationship with Gerdau, Defendant

Gerdau Ameristeel, and Defendant Gerdau MacSteel.

160.   Defendant Belloc knew that Plaintiff had reason to be confident that

his advantageous employment and business relationship with Gerdau,

Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel would continue

indefinitely and at least until he chose to voluntarily terminate employment

with or retire from Gerdau, Defendant Gerdau Ameristeel, and Defendant

Gerdau MacSteel employment.

161. Defendant Belloc knew that Plaintiff annually earned a substantial salary and bonus and received health care, retirement, and other fringe benefits from Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel because of his advantageous employment and business relationship with them.

162. Defendant Belloc knew that Plaintiff was eligible for substantial additional benefits under the Labour laws of Brazil because of his advantageous employment and business relationship with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel.

163. Defendant Belloc intentionally and tortiously interfered with Plaintiff's advantageous employment and business relationship and expectancy with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel when he denied Plaintiff the position of MacSteel Controller or Operations Strategic Controller, a position for which he was amply qualified; terminated Plaintiff's employment without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause; and attempted to coerce him into signing the proposed severance agreement because he intended to replace him with a younger Brazilian who was to be transferred from Gerdau.

164. Defendant Belloc intentionally and tortiously interfered with Plaintiff's advantageous employment and business relationship and expectancy

with Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel when he terminated Plaintiff's employment without cause; denied him other comparable Gerdau, Defendant Gerdau Ameristeel, and Defendant Gerdau MacSteel job opportunities without cause; attempted to coerce him into signing the proposed severance agreement; and denied him: amounts equivalent to Brazilian social security benefits due to him; FGTS fund benefits due to him, including the termination payment equivalent to 40% of the FGTS fund that was due to Plaintiff upon termination of his employment; 78 days of pay in lieu of requisite 78 days advance notice of employment termination [30 days plus 3 additional days per year of service (3 x 16=48 additional days) (total 78 days)]; expenses for airfare, moving expenses, and housing expenses to enable Plaintiff and his family to move back to Brazil, among other benefits.

165. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained damages, including, but not limited to, loss of past, present and future salary, bonuses, incentive compensation, and earning capacity; loss of the value retirement, health care, 401(k), and other benefits; loss of compensation and benefits to which he is entitled under the Labour and other laws of Brazil; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary

pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Jose Antunes respectfully requests that this Honorable Court grant the following remedies:

a.     Declare that the aforementioned practices and actions of Defendants are unlawful;

b.     Declare that the acts and practices outlined above are in violation of the 42 U.S.C. §1981, the ELCRA, and Michigan common law;

c.     Enjoin and permanently restrain these practices;

d.     Direct Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

e.     Award Plaintiff all lost past, present and future salary, bonuses, and incentive compensation, compensation and benefits to which he is entitled under the Labour and other laws of Brazil, and the value of all lost past, present and future employee healthcare, retirement, 401(K), pension, and other fringe benefits to which he is entitled;

f.     Award Plaintiff compensatory damages for mental anguish, emotional distress, humiliation and injury to his reputation;

g.     Award Plaintiff punitive and/or exemplary damages;

h.      Award Plaintiff's reasonable attorney fees and costs, including

expert witness fees; and

i.      Grant such other legal or equitable relief as this Court deems

appropriate.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN P.C.**

BY: _____

Raymond J. Carey (P33266)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(248) 865-0001
rcarey@gmgmklaw.com

Dated: March 18, 2020

## DEMAND FOR TRIAL BY JURY

Plaintiff Jose Antunes, by his attorneys, GASIOREK, MORGAN, GRECO,

MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO,**
**MCCAULEY & KOTZIAN, P.C.**

BY:   _____
Raymond J. Carey (P33266)
Attorney for Plaintiff
30500 Northwestern Hwy, Ste. 425
Farmington Hills, MI 48334
(248) 865-0001
rcarey@gmgmklaw.com

Date:  March 18, 2020

64