UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSE ANTUNES,

               Plaintiff                             Case No. 20-10724

v.                                          HON. MARK A. GOLDSMITH

GERDAU MACSTEEL, INC, et al.,

               Defendants.

_____/

**OPINION & ORDER
(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
STRIKE (Dkt. 37), (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT (Dkt. 28), (3) GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (Dkt. 29), AND (4) DENYING AS MOOT THE PARTIES' JOINT MOTION
TO EXTEND TRIAL-RELATED DATES (Dkt. 48)**

Four motions are before the court: Defendants' motion to strike (Dkt. 37), Plaintiff Jose

Antunes's motion for partial summary judgment (Dkt. 28), Defendants' motion for summary

judgment (Dkt. 29), and the parties' joint motion to extend trial-related dates (Dkt. 48). For the

foregoing reasons, the Court grants in part and denies in part Defendants' motion to strike, denies

Antunes's motion for partial summary judgment, and grants Defendants' motion for summary

judgment.[1] Consequently, the Court denies as moot the parties' joint motion to extend trial-related

dates.

_____

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided
based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to
the motion for partial summary judgment, the briefing for the motion includes Defendants'
response (Dkt. 33) and Antunes's reply (Dkt. 38). In addition to the motion for summary judgment,
the briefing for the motion includes Antunes's amended response (Dkt. 40-1)—filed as an exhibit
to his response to Defendants' motion to strike—and Defendants' reply (Dkt. 38). In addition to
the motion to strike, the briefing for the motion includes Antunes's response (Dkt. 40) and
Defendants' reply (Dkt. 41).

# I. BACKGROUND

Antunes brings this action against Defendants Gerdau Macsteel, Inc. (Macsteel), Gerdau Ameristeel U.S., Inc. (Ameristeel), and Rodrigo Belloc based on his employment termination. Compl. (Dkt. 1). Antunes is a 52-year-old man of Brazilian ancestry and national origin. Antunes Dep. at 21 (Dkt. 29-2). Macsteel and Ameristeel are United States corporations that produce specialty steel products and have various locations in Michigan. Id. at 13–15, 19–20. They are subsidiaries of Gerdau S.A., a Brazilian company, which is not named as a defendant in this action. Id. at 13; Hinojosa Dep. at 69 (Dkt. 29-10). Belloc is Macsteel's president. Belloc Dep. at 21 (Dkt. 29-11).

In 2003, Gerdau S.A. hired Antunes in Brazil. Antunes Dep. at 25. In 2006, Antunes was transferred from Gerdau S.A. to Ameristeel, for which he was to work in their Tampa, Florida location for one to three years before returning to his employment with Gerdau S.A. in Brazil. Id. at 25–26. Antunes worked for Ameristeel in Florida until 2008 and, during this time, was considered to be a Brazilian expatriate. Id. at 29.

In 2008, Macsteel offered him a position as a financial planning manager for its corporate office in Jackson, Michigan. Id. at 26. Antunes signed an offer letter from Macsteel, which stated that his employment would begin on June 1, 2008. 5/7/2008 Offer Letter (Dkt. 29-3). The letter also stated that "[y]our employment may be terminated by either you or Gerdau Macsteel at any time," and that the employment agreement is "governed by the laws of the State of Michigan." Id. It did not address Antunes's employment status with Gerdau S.A. From June 2008 to March 2014, Antunes received paychecks from Macsteel and Gerdau S.A. Antunes Dep. at 59. From April 2014 until Macsteel terminated his employment on December 6, 2019, he received paychecks from Macsteel only. Id. at 60.

In October 2012, Antunes's title changed from financial planning manager to accounting manager. Antunes Dep. at 58. As accounting manager, Antunes compiled data from the controllers at each of Macsteel's mills to create monthly financial reports, which were then sent to Gerdau S.A. Id. at 94–95. Antunes stated that he also managed accounts payable, negotiated shared service agreements between Macsteel and Ameristeel, reviewed results from internal and external auditing each month, and worked with the controllers to improve processes and controls based on the audits. Id. at 93, 96–97. During his time at Macsteel, Antunes reported to four individuals sequentially: Jeff Karmol, the vice president group controller; Jose Altamir, the director of financial planning; Mark Marcucci, the president of Macsteel; and Belloc, who succeeded Marcucci as president. Id. at 59, 72–73.

According to Marcucci, Antunes lacked the requisite experience and knowledge to perform the work of the controllers, in part because he had never worked at a steel plant. Marcucci Dep. at 110–111 (Dkt. 29-12). Consequently, Antunes presented at monthly meetings a high-level overview of profit and loss. Id. at 116. The general managers of the mills and two controllers, Donna Blackwell and another individual, then provided detailed information on cost deviations. Id. at 114–118.

Macsteel hired Blackwell—whom Antunes points to as a comparator in relation to his sex discrimination claim—as the controller of its mill in Monroe, Michigan in 2014. Blackwell Dep. at 15–16 (Dkt. 29-13). In 2017, Macsteel promoted Blackwell to regional controller. Id. at 24. In this role, two of the company's three mills reported to her, and she was responsible for approximately 70 percent of Macsteel's profitability. Id. at 25; Marcucci Dep. at 129.

In 2019, Macsteel began transitioning the position of president from Marcucci to Belloc. Antunes Dep. at 73. Based on his review of Macsteel's data, Belloc discovered that the company's

profitability had suffered and, consequently, determined that the company needed "significant changes" to recover its profitability. Belloc Dep. at 40. Belloc worked with the Macsteel leadership team to restructure the business to save costs, which included shutting down one of Macsteel's three mills, conducting layoffs, and eliminating positions. Rodrigues Dep. at 206–210 (Dkt. 29-8). In the fall of 2019, Macsteel offered 336 employees, including Antunes, voluntary resignations as part of its company-wide Voluntary Separation Incentive Program. Antunes Dep. at 116; Tabor Aff. ¶¶ 10–11 (Dkt. 29-16). Antunes declined the voluntary resignation offer. Antunes Dep. at 121–122.

In addition, Belloc determined that, as part of his plan to improve Macsteel's finances, he needed someone with experience in the steel business—and preferably knowledge of Gerdau—to work with him and the vice president to establish a strategic plan for the business. Belloc Dep. at 40. Accordingly, in August 2019, Macsteel posted a job opening for a new position in its Jackson, Michigan office: Operations Strategic Controller (OSC). Id. at 66; OSC Job Posting (Dkt. 29-5).

Belloc stated that he was looking for an individual who had experience in a controller position, in finding new business opportunities, and in developing strategic business plans. Id. at 75–77. Macsteel leadership preferred to fill the position internally, but it also considered candidates from other Gerdau S.A. subsidiaries. Id. at 66.

Ten to twelve individuals applied for the OSC position, including Antunes; Blackwell; Felipe Campomizzi, a 32-year-old Brazilian male; and Brandt Hinojosa, a 57-year-old white American male and Macsteel's Manager of Financial Planning and Analysis. Id. at 81; Blackwell Dep. at 47; Hinojosa Dep. at 19, 80, 104. Belloc and Andre Rodrigues, the vice president of human resources, interviewed seven individuals, including Antunes, during the first round of interviews. Id. at 81, 85. Belloc took notes during the interviews, and he stated that he noted the ages of some

Brazilian candidates because, unlike the American candidates, they offered their ages when asked about their background and qualifications. Id. at 124–125.

Belloc and Rodrigues interviewed Antunes in November 2019. Antunes Dep. at 145. Antunes testified that the interview was "tense" and that he was required to defend his job. Id. at 146. He asked Belloc if Belloc were considering firing him, and Belloc told him no, but that anyone could be fired. Id. at 149. Belloc testified that Antunes's interview was "very different" from the other interviews because Antunes spent most of the time discussing how he was being treated unfairly at the company and expressing his dissatisfaction that he had received more work but had not received an increase in salary. Belloc Dep. at 105–108.

Belloc and Rodrigues did not recommend Antunes for a second interview with Macsteel's leadership team. Id. at 91. Instead, they recommended Blackwell, Hinojosa, and Campomizzi. Id. Belloc and Macsteel's leadership team ultimately offered Campomizzi the position. Id. at 132.

Campomizzi—who figures in Antunes's age discrimination claim—earned a bachelor's degree in industrial engineering in Brazil and completed executive education in valuation. Campomizzi Dep. at 8–9 (Dkt. 29-14). Before accepting the OSC position, he completed a job rotation program at a former Gerdau company for one-and-a-half years, worked for a Gerdau subsidiary in Brazil as a strategic and financial planning specialist, and then worked as the Chief Financial Officer of Gerdau Summit, a joint venture between Gerdau S.A. and two other companies. Id. at 12–16.

On December 6, 2019, Macsteel terminated Antunes, along with two other employees—a 24-year-old Hispanic man and a 23-year-old white woman. Rodrigues Dep. at 205; Tabor Aff. ¶ 21. According to Macsteel, it terminated Antunes and the other employees because it eliminated their job positions in a company-wide cost saving effort. Rodrigues Dep. at 206, 216. Macsteel divided Antunes's job responsibilities between other employees. Tabor Aff. ¶ 20; Belloc Dep. at 138–139.

Antunes brought this action, in which he asserts the following claims: breach of contract/wrongful discharge; discrimination on the basis of alienage, in violation of 42 U.S.C. § 1981; discrimination and conspiracy to engage in discrimination on the basis of alienage/national origin, age, and sex, in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA); violation of the Equal Pay Act (EPA); tortious interference with an employment contract; and tortious interference with an advantageous business relationship and expectancy.  Compl. ¶¶ 97–165.

## II. ANALYSIS

"Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."  Brainard v. Am. Skandia Life Assur. Corp., 432 F.3d 655, 667 (6th Cir. 2005).  Accordingly, the Court first addresses Defendants' motion to strike Antunes's response to their motion for summary judgment and its accompanying affidavit and exhibits.  The Court then addresses Antunes's motion for partial summary judgment and Defendants' motion for summary judgment.

### A. Motion to Strike

Defendants request that the Court: (i) strike Antunes's counter-statement of material facts in his response to their motion for summary judgment and deem Defendants' statement of material facts admitted as true; (ii) strike Antunes's response in its entirety, including Antunes's affidavit and related exhibits; and (iii) award Defendants attorney fees and costs associated with the motion. The Court addresses each request in turn.  The Court denies the request to strike Antunes's counter-statement of material facts and Antunes's response in its entirety.  The Court grants in part the request to strike Antunes's affidavit: the Court strikes all paragraphs of the affidavit except paragraphs 3 and 6–8.  The Court denies as moot the request to strike exhibits attached to the affidavit, and it denies the request for attorney fees.

### 1. Counter-Statement of Material Facts

Defendants seek to strike the counter-statement of material facts contained in Antunes's response to their motion for summary judgment because the counter-statement of material facts does not comply with the practice guidelines of Judge Davis, to whom this case was previously assigned. Def. Mot. to Strike at 5–6. The practice guidelines state that a response to a motion for summary judgment must begin with a counter-statement of material facts stating which facts are admitted and which are contested and that the paragraph numbering must correspond to the moving party's statement of material facts. Id. at 5. The practice guidelines also state that any uncontested fact will be deemed admitted. Id.

As an exhibit to his response to the motion to strike, Antunes filed an amended response to the motion for summary judgment. Pl. Am. Resp. to Def. Mot. for Summary J. (Dkt. 40-1). This amended response adheres to the practice guidelines by responding to Defendants' statement of material facts as admitted or denied and appears to be otherwise virtually identical to his initial response. Because Antunes ultimately filed a compliant response, the Court denies Defendants' request to strike Antunes's counter-statement of material facts and deem Defendants' statement of material facts admitted as true. But it strikes Antunes's initial, non-compliant response and considers solely his subsequent, compliant response in evaluating Defendants' motion for summary judgment.

### 2. Affidavit, Response, and Related Exhibits

Defendants contend that the Court should strike Antunes's 35-page affidavit—which he submitted as an exhibit to his response to Defendants' motion for summary judgment and which contains 85 pages of attached exhibits—for two reasons. Def. Mot. to Strike at 2. First, it contradicts Antunes's prior deposition testimony and is an improper attempt to alter and repackage

that prior testimony.  Id.  Second, it contains inadmissible speculation, conclusory statements, and legal arguments.  Id.

Striking an affidavit or a portion of an affidavit lies in the district court's sound discretion.  See Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 906 (6th Cir. 2006).  Rule 56(c)(4) requires that affidavits "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. Pro. 56(c)(4).  Thus, statements contained in affidavits that are "nothing more than rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law."  Mitchell v. Toledo Hosp., 964 F.2d 577, 584–585 (6th Cir. 1992).  Legal arguments and conclusions set forth in affidavits are likewise inadmissible.  See Harrah's Ent., Inc. v. Ace Am. Ins. Co., 100 F. App'x 387, 394 (6th Cir. 2004) ("It is well settled that courts should disregard conclusions of law (or ultimate fact) found in affidavits submitted for summary judgment.") (punctuation modified); Onge v. Livingston Cnty., No. 04-71329, 2005 WL 8154803, at *2 (E.D. Mich. July 8, 2005) (striking a reply brief that was accompanied by affidavits because the attached affidavits "as a whole read similar to a legal brief and [were] an extension of Defendant's legal arguments").

When affidavits are filed after depositions at the summary-judgment stage, the district court's inquiry is not limited to Rule 56(c)(4).  Aerel, 448 F.3d at 908–909.  Rather, the United States Court of Appeals for the Sixth Circuit has explained that "a district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  Id. at 908. Courts should "narrowly" construe whether an affidavit directly contradicts prior deposition testimony. Johnson v. Ford Motor Co., 13 F.4th 493, 501 (6th Cir. 2021).  However, when a deponent denies

having knowledge of a certain subject during the deposition, the deponent is deemed to have contradicted that testimony if the deponent provides specific information on that subject in a subsequent affidavit. Id. A court should strike a directly contradictory affidavit unless the party opposing summary judgment provides a "persuasive justification" for the contradiction. Aerel, 448 F.3d at 908. If there is no direct contradiction, the court should not strike or disregard the affidavit "unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." Id. A non-exhaustive list of factors to guide the determination of whether there is a "sham fact issue" includes the following: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." Id. (punctuation modified).

The Court finds that each paragraph in the affidavit, except for paragraphs 3 and 6–8, should be stricken. Paragraphs 3 and 6–8 of the affidavit describe Antunes's job duties and are, therefore, based on his personal knowledge. While they describe job duties that Antunes did not testify about, they do not contradict his prior testimony. Antunes seems to have maintained throughout his deposition that the accounting manager job description listed only "a portion" of his job duties. Antunes Dep. at 77. For example, in response to being asked what duties he performed that were not listed in the job description, Antunes responded, "There would be a long list. For instance, . . .," and then proceeded to provide examples of additional duties that he assumed. Id.

The rest of the affidavit, however, is improper. Paragraph 22 contradicts Antunes's prior testimony. It states that Antunes believes that the voluntary separation program was extended to him "because . . . Belloc intended to terminate my employment and had hoped that I would

voluntarily terminate my employment."  Antunes Aff. ¶ 22 (Dkt. 36-1).  When Antunes was asked about the voluntary separation program during his deposition, however, he stated that he did not "pay much attention" to the offer because he knew he was not going to consider it and that he did not know who made the decision as to when to offer the program.  Antunes Dep. at 117–120.

The remainder of the affidavit resembles an attempt to create factual disputes by using Antunes as a mouthpiece to report on various developments that his attorney learned in discovery and thereby supplement the legal arguments offered in Antunes's response.  The affidavit presents conclusions of law and ultimate fact, and it contains statements that are outside Antunes's personal knowledge.  For example, paragraphs 11–17 report what Antunes learned in discovery about Blackwell's job duties and pay.  Antunes Aff. ¶¶ 11–17.  The affidavit also states that Antunes learned in discovery what notes Belloc took during interviews for the OSC position, and it summarizes the notes.  Id. ¶¶ 27, 30–31.  And it contains legal conclusions such as the following: "[t]he decisions to not select me for the [Gerdau] Macsteel [OSC] position and to terminate my employment because of my age and protected employment."  Id. at 12.  The affidavit is "used as [an] additional too[l] for argument and not to present facts."  Onge, 2005 WL 8154803, at *2.

Therefore, the Court strikes each paragraph in the affidavit except for paragraphs 3 and 6–8.  See A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co., 650 F.2d 118, 121 (6th Cir. 1981) ("When ultimate facts or conclusions of law appear in an affidavit which also contains the proper subject of affidavit testimony, facts within the personal knowledge of the affiant, the extraneous material should be disregarded, and only the facts considered.").

Defendants argue that the Court should also strike the 17 exhibits attached to the affidavit and the response in its entirety because the affidavit and exhibits are an attempt to circumvent the page limit for the response.  Def. Mot. to Strike at 2.  Striking Antunes's response in its entirety,

10

however, would not bring clarity to the record. Cf. Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (6th Cir. 1953) ("Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts").

The Court also grants Antunes's request to exceed the page limit for his response by five pages—just as the Court permitted Defendants to exceed the page limit for their filing by five pages[2]—and so the Court is satisfied that the substance of Antunes's response brief falls within an allowable page limit.

Accordingly, the Court denies Defendants' request to strike Antunes's response in its entirety.

Further, because the Court does not rely on or refer to any of the 17 exhibits attached to the affidavit, it denies as moot the request to strike the exhibits. See Cleary v. Cnty. of Macomb, No. 06-15505, 2009 WL 837703, at *9 (E.D. Mich. Mar. 24, 2009), aff'd, 409 F. App'x 890 (6th Cir. 2011) ("In deciding the motion for summary judgment, the Court did not refer to or rely on any of the opposed exhibits. Therefore, the Court denies all motions and requests to strike as moot.").

### 3. Attorney Fees

Defendants also seek attorney fees incurred in bringing the motion to strike. Def. Mot. to Strike at 3. Rule 56(h) provides that, "[i]f satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court . . . may order the submitting party to pay the other party the reasonable expenses, including attorney fees, it incurred as a result." Fed. R. Civ. P. 56(h). Defendants have not shown that Antunes's filings were made in bad faith or for the purpose of delay. Therefore, the Court denies their request for attorney fees.

---

[2] On March 15, 2021, the Court entered a text-only order granting Defendants' motion to file excess pages for the brief in support of their motion for summary judgment.

**B. Breach of Contract Claim**[3]

Antunes filed a motion for partial summary judgment on his breach of contract claim against Macsteel. Defendants also seek summary judgment on this claim.

Antunes argues that he is entitled to summary judgment because there is no genuine dispute of material fact that a valid employment contract existed between him and Macsteel and that, under the constitution and labor laws of Brazil as incorporated by Michigan law, his employment could not be terminated unless certain conditions were met, none of which was met here. Pl. Mot. for Partial Summary J. at 19–21. Specifically, Antunes submits that he could not be terminated without cause, without advance notice (or pay instead of advance notice), and without severance benefits. Id. at 19–20. Defendants assert that Antunes was an at-will employee and that his employment with Macsteel did not incorporate Brazilian law. Id. at 14–21.[4]

Both Antunes and Defendants agree that Antunes had a valid employment agreement with Macsteel. See Pl. Mot. for Partial Summary J. at 1; Def. Resp. to Pl. Mot. for Partial Summary J. at 2–3. The breach of contract claim, therefore, involves two issues. The first is whether Antunes's

---

[3] In assessing whether either party is entitled to summary judgment on any claim, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

[4] Defendants also argue that they are entitled to summary judgment on Antunes's breach of contract claim in part because it is premised on (i) Antunes's employment relationship with Gerdau S.A., which is not named as a defendant, and (ii) the allegation that Gerdau S.A. violated Brazilian law when it terminated his employment. Def. Mot. for Summary J. at 28–29. But Antunes asserts that the basis of his claim is his employment contract with Macsteel, Macsteel's subsequent breach of that contract, and Michigan law pertaining to implied contracts. See Pl. Mot. for Partial Summary J. at 12. Therefore, Antunes does not seek to hold Gerdau S.A. liable for the actions of Macsteel but, rather, hold Macsteel liable for its own actions, and Defendants are not entitled to summary judgment on the ground that Antunes did not name Gerdau S.A. as a defendant.

employment agreement provided that he could be terminated only for cause.  The second is whether, if the agreement provided that Antunes could be terminated at will, that provision is unenforceable.  The Court addresses each issue in turn.

### 1.  Just Cause Termination

Michigan law provides that relations between employers and their employees are generally terminable at the will of either party.  Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 271 (Mich. 1991).  However, the Michigan Supreme Court has "recognized the concept of an implied 'just cause' limitation on discharge."  Elsey v. Burger King Corp., 917 F.2d 256, 259 (6th Cir. 1990) (citing Toussaint v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 895 (Mich. 1980)).  A just cause limitation on discharge can be implied "either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements."  Toussaint, 292 N.W.2d at 880.

Nevertheless, where an employment contract unambiguously provides for termination at will, the agreement of the parties will be respected.  See Reid v. Sears, Roebuck & Co., 790 F.2d 453, 461 (6th Cir. 1986) ("Though Toussaint holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will.  It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one."); Cox v. Elec. Data Systems Corp., 751 F. Supp. 680, 688 (E.D. Mich. 1990) (explaining that both Michigan state and federal courts, and the Sixth Circuit, have "repeatedly held that employees cannot have 'legitimate expectations' of continued employment—and, thus, no breach of implied just cause contract claim can survive—when the employee and employer have entered into an employment agreement which expressly provides that the employee's employment is terminable at-will");

Bracco v. Mich. Tech. Univ., 588 N.W.2d 467, 472 (Mich. Ct. App. 1998) ("The 'implied contract' theory of Toussaint may not be relied upon in Michigan when there is an express contract covering the same subject matter.").

Antunes's offer letter from Macsteel, which he signed, stated that "[Antunes's] employment may be terminated by either [Antunes] or Gerdau Macsteel at any time."  5/7/2008 Offer Letter. This clear and unambiguous language confirms that Antunes was terminable at will.  Therefore, looking at other "evidence" that Antunes references is unavailing.

Even if the Court were to consider the evidence Antunes points to, it does not overcome this express language.  Antunes first points to "the absence of an unambiguous 'at will' disclaimer" in his offer of employment from Macsteel.  Pl. Mot. for Partial Summary J. at 23–24.  But his offer of employment did contain an unambiguous provision stating that he was terminable at will. Courts have found that the type of language in the offer letter at issue in this case constitutes a declaration of at will employment—even if it does not use the exact term "at will."  See, e.g., Elsey, 917 F.2d at 260 (finding that a policy manual's statement that "employees and employer have the right to terminate employment at any time for any circumstance, and for any reasons that are attributed by the employer or employee" was "an explicit declaration of at-will employment"); see also Biggs v. Hilton Hotel Corp., 486 N.W.2d 61, 63 (explaining that, because Michigan law presumes that employees are terminable at will, the absence of an explicit "at will" statement does not indicate that an employee can be terminated only for cause).

Antunes argues that Gerdau S.A.'s ethical guidelines and his signed acknowledgement of them are proof that there was a just cause limitation on his termination.  Pl. Mot. for Partial Summary J. at 23.  In 2009, Antunes signed a form acknowledging that he received a copy of the Gerdau code of ethics, that his "continued service" with Macsteel required him to adhere to the guidelines, and

that "failure to do so can result in disciplinary action up to, and including, termination of [his] employment by Gerdau Macsteel."  Policy Acknowledgement (Dkt. 29-7).

But the fact that Antunes could be terminated if he failed to abide by the code of ethics does not mean that he could be terminated only if he failed to abide by the code of ethics.  Antunes does not point to any evidence suggesting that Macsteel's ethical guidelines provide an exclusive list of actions that could result in discipline.  The Michigan Supreme Court has explained that "[a] nonexclusive list of common-sense rules of behavior that can lead to disciplinary action or discharge, clearly reserves the right of an employer to discharge an employee at will."  Rood v. Gen. Dynamics Corp., 507 N.W.2d 591, 598 (Mich. 1993); see also Rowe, 473 N.W.2d at 275 (rejecting plaintiff's contention that a "Rules of Personal Conduct" form, which provided that plaintiff would be dismissed if she engaged in prohibited conduct, created a just-cause contract when "[n]othing in the rules suggested that the enumerated conduct was the only basis for dismissal, and the rules were consistent with a termination-at-will policy").  Further, the Macsteel code of ethics policy, on which Antunes received training, see Antunes Dep. at 46–47, stated at the time of Antunes's training that "[e]mployment with the company is at will, which means that either the company or the employee may terminate the employment relationship at any time for any reason, without notice."  Gerdau Code of Ethics Policy at 2 (Dkt. 33-3).

Antunes also states that the "declarations and certifications" that Gerdau S.A., Ameristeel, and Macsteel representatives made in support of his visas and Green card petitions were "reasonably capable of instilling a legitimate expectation" that his employment at Macsteel could be terminated only for cause.  Pl. Mot. for Partial Summary J. at 23–24.  Antunes does not specify what "declarations and certifications" made by Gerdau representatives instilled a legitimate expectation that he could be terminated only for cause.  In his deposition, he seemed to suggest that the fact

that Gerdau helped him obtain a visa and green card was itself a sign that he could not be fired without cause.  See Antunes Dep. at 205.  But "oral statements of job security must be 'clear and unequivocal to overcome the presumption of employment at will.'"  Highstone v. Westin Engineering, Inc., 187 F.3d 548, 551 (6th Cir. 1999) (quoting Rowe, 473 N.W.2d at 271).  Antunes does not point to any clear and unequivocal statement that Defendants made about just cause termination.

Therefore, Antunes's offer letter from Macsteel provides that he was terminable at will, and the other evidence on which he relies does nothing to undermine this conclusion.[5]  See Toussaint, 292 N.W.2d at 880.

## 2.  Enforceability of the Agreement

The next issue relevant to Antunes's breach of contract claim is whether, even if his employment agreement with Macsteel provided for at will termination, that provision is unenforceable.  This, in turn, raises a choice-of-law question.

It is undisputed that Antunes's offer letter stated that his employment agreement with Macsteel was governed by Michigan law.  See 5/7/2008 Offer Letter.  "Both Michigan choice-of-law rules and general equitable choice-of-law policies support enforcing parties' agreed-upon choice-of-law clauses absent any strong public policy concerns to the contrary."  In re Dow Corning Corp., 419

---

[5] Antunes also argues that the rights and entitlements provided to him by the constitution and labor laws of Brazil are the equivalent of policy statements, noting that the Michigan Supreme Court has considered policy statements in several cases involving the interpretation of employment agreements.  Pl. Mot. for Partial Summary J. at 23 n.32 (citing Toussaint, 292 NW 2d at 890–892; Rood, 507 N.W.2d at 606–607; Renny v. Port Huron Hosp., 398 N.W.2d 327, 333–336 (Mich. 1986)).  But those cases involved "clear and specific employer policy statements, regarding employee discharge" set forth in specific documents issued by employers and distributed to employees.  Rood, 507 N.W.2d at 607.  Antunes does not present evidence that statements on the constitution and labor laws of Brazil were set forth in documents distributed to employees of any Gerdau-related entities with which he worked.

16

F.3d 453, 548 (6th Cir. 2005). But Antunes contends that Brazilian law applies to his employment agreement with Macsteel. He asserts that, through the application of Michigan law, specific rights and entitlements under the constitution and labor laws of Brazil were terms and conditions of his employment with Macsteel. Pl. Mot. for Partial Summary J. at 12. These rights and entitlements include not only just cause termination but also advance notice of termination (or pay in lieu of advance notice) and severance benefits, which Brazilian law requires, while Michigan law does not. Id. For support, he relies on what he terms Michigan's "implied incorporation doctrine" and Michigan conflict of law standards.[6] As explained below, these principles do not mandate application of Brazilian law or its "incorporation" into the terms and conditions of Antunes's employment with Macsteel. And they do not support disregarding the parties' choice of law.

What Antunes terms Michigan's "implied incorporation doctrine" is the principle that "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated in its terms." Von Hoffman v. City of Quincy, 71 U.S. 535 (1866); see also Pl. Mot. for Partial Summary J. at 15–16 (citing LaFontaine Saline, Inc. v. Chrysler Grp., LLC, 852 N.W.2d 78 (Mich. 2014); Ziegler v. Witherspoon, 49 N.W.2d 318, 327 (Mich. 1951); Von Hoffman, 71 U.S. at 550). Antunes does not specify where the employment agreement between him and Macsteel, a U.S. corporation, was made. But it is undisputed that the employment agreement was to be performed in Michigan and that it contained an express selection of Michigan law as the applicable law. In

---

[6] Antunes also relies on Michigan law pertaining to "implied contracts" and Toussaint. Pl. Mot. for Partial Summary J. at 12; Pl. Reply at 2. The cases that Antunes cites regarding "implied contracts," together with Toussaint, examine only whether an implied limitation on an employer's right to terminate an employee exists. See Pl. Mot. for Partial Summary J. at 14–15 (citing Lytle, 579 N.W.2d at 906; Rood, 507 N.W.2d at 591; Bullock v Automobile Club of Mich., 444 N.W.2d 114 (Mich. 1989); Renny v. Port Huron Hosp., 398 N.W.2d 327 (Mich. 1986)). As discussed above, there is no implied limitation here.

17

light of those circumstances, it is entirely without merit to argue that a foreign country's law was somehow impliedly incorporated into the agreement.

Antunes also argues that, under Michigan conflict of law standards, rights and entitlements under Brazilian law applied to his employment with Macsteel. Pl. Mot. for Partial Summary J. at 21–22. A federal court exercising diversity jurisdiction applies the choice-of-law or conflict rules of the forum state, which, here, is Michigan. Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998). In resolving choice-of-law issues, Michigan courts follow §§ 187 and 188 of the Second Restatement of Conflict of Laws. Chrysler Corp. v. Skyline Indus. Servs., Inc., 528 N.W.2d 698, 703 (1995).

Section 187 "instructs courts to generally respect choice-of-law provisions." Wise v. Zwicker & Associates, P.C., 780 F.3d 710, 715 (6th Cir. 2015). It provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless either (i) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (ii) the application of the chosen state's law "would be contrary to a fundamental policy" of a state that has a materially greater interest than the chosen state in the disputed issue and that would have supplied the governing law in the absence of the parties' selection. Restatement (Second) of Conflict of Laws § 187(2).

Antunes's offer letter from Macsteel stated that his employment agreement was governed by Michigan law. 5/7/2008 Offer Letter. The first scenario in § 187(2)—that the parties' choice of law governs unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice—does not undermine the parties' choice of law. Michigan has a substantial relationship to the parties and the transaction at issue here. As Defendants note, Antunes lives in Michigan; Macsteel is located in Michigan; Antunes

worked for Macsteel in Michigan; and Macsteel terminated Antunes in Michigan. The notion that Michigan has no substantial relationship to the parties and the transaction is entirely without merit.

So too is Antunes's argument under the second scenario in § 187(2)—that the application of Michigan law "would be contrary to a fundamental policy" of a state that has a materially greater interest than Michigan and that would have supplied the governing law in the absence of the parties' choice of law. He argues that the provision in the Macsteel offer indicating that it is governed by Michigan law is "unenforceable . . . to the extent Michigan law were to be applied in a manner that deprives [him] of his protection against 'arbitrary dismissal or dismissal without cause' from his employment" and of his other contractual rights and entitlements. Pl. Mot. for Partial Summary J. at 21. This is, of course, nonsensical. It amounts to arguing that Brazilian law must be applied because, in its absence, he is deprived of its protection. No principle of choice-of-law argues for application of one jurisdiction's law over another simply because it is more favorable to the party invoking it.

Antunes seems to recognize that he must do more—that he must show that Brazil has some greater interest than Michigan does in his employment relationship. But other than offering in a footnote conclusory statements that Brazil has an interest in his employment relationship, see Pl. Mot. for Partial Summary J. at 22 n.31, he has not done so. He does not compare Brazil's interest in his employment relationship to Michigan's interest or offer authority indicating that a foreign country would be concerned about an expatriate working for a United States company in the United States. Moreover, there is no basis to conclude that, in the absence of the parties' choice, Brazilian law would apply.[7]

_____

[7] Antunes also relies on §§ 188 and 196 of the Second Restatement of Conflict of Laws in contending that Brazilian law protections applied to his employment with Macsteel. See Pl. Mot. for Partial Summary J. at 12, 17 n.25, 18–19, 22. However, § 188 "applies in all situations where

Because Antunes has not created a genuine factual dispute that he could be terminated only for cause or that rights afforded to him under Brazilian law were terms and conditions of his employment with Macsteel, the Court denies his motion for partial summary judgment. Defendants are entitled to summary judgment on Antunes's breach of contract claim against Macsteel.[8]

## C. Discrimination Claims

Antunes alleges that Defendants discriminated against him and conspired to discriminate against him on the basis of alienage, in violation of § 1981,[9] and on the basis of national origin, age, and sex, in violation of ELCRA, through the following actions: (i) not increasing his compensation to account for his actual job duties and responsibilities; (ii) not selecting him for the

---

there has not been an effective choice of the applicable law by the parties." Restatement (Second) of Conflict of Laws § 188; see also id., comment a ("The rule of this Section applies in all situations where there has not been an effective choice of the applicable law by the parties."); Johnson v. Ventra Group, Inc., 191 F.3d 732, 741 (6th Cir. 1999) (noting that "§ 188 only applies to cases where the parties have not contractually agreed to a choice of law provision" and finding that, because the plaintiff agreed to a contractual choice of law provision, the section did not apply). Similarly, § 196 specifies which law applies to contracts for services "in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws § 196. Here, there is a choice-of-law provision in Antunes's offer letter from Macsteel, and so §§ 188 and 196 are inapplicable.

[8] Antunes cannot prevail on his claim to the extent it is based on the actions of Ameristeel. He testified that his employment with Ameristeel ended in 2008, Antunes Dep. at 20, and there is no evidence that he was jointly employed by Macsteel and Ameristeel at the time of his termination.

[9] Antunes also brings an alienage discrimination claim under ELCRA. However, ELCRA does not list alienage as a protected category. See Mich. Comp. L. § 37.2202(1)(a) (prohibiting discrimination in employment on the basis of "race, color, national origin, age, sex, height, weight, or marital status"). Antunes does not offer any authority to suggest that alienage is a protected category under the statute. Therefore, he can proceed on his alienage discrimination claim only under § 1981.

OSC position; (iii) terminating his employment; and (iv) paying him less than Blackwell.[10] Compl. ¶¶ 105–140. Defendants seek summary judgment on each of Antunes's discrimination claims.

As an initial matter, the Court finds that Antunes cannot prevail on his claims to the extent they are based on any actions by Ameristeel. Antunes stopped working at Ameristeel in 2008, see Antunes Dep. at 20, 30, and the alleged discriminatory conduct occurred after this time.

---

[10] In his complaint, Antunes also alleged that Defendants discriminated against him by not providing advance notice and severance benefits as part of his termination. Neither party addresses this allegation. To the extent this claim relies on the incorporation of Brazilian law pursuant to Michigan law, Antunes could not prevail on it for the same reasons as stated in the breach of contract claim.

In addition, Antunes alleged that Defendants discriminated against him by attempting to coerce him to sign a severance agreement. Defendants argue that, because Antunes testified that he ignored the voluntary resignation offer and never considered it, he has abandoned this claim. Def. Mot. for Summary J. at 11 n.8. Antunes does not respond to this argument and, therefore, may be deemed to have abandoned the claim. Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) (stating that the Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment"). Even if the Court considers the claim, Antunes does not point to any evidence that Defendants attempted to coerce him to sign a severance agreement.

Further, Antunes alleged that Defendants discriminated against him by failing to provide him other comparable job opportunities after his termination. Defendants argue that they were not obligated to provide Antunes with alternative employment after he was terminated and that Antunes has provided no evidence that Defendants transferred other employees into open positions. Id. Antunes does not respond to this argument and, therefore, may be deemed to have abandoned the claim. See Brown, 545 F. App'x at 372. Even if the Court considers the claim, an employer is not generally required to transfer an employee to another position in the company after the employee's job position is eliminated. See Bender v. Hecht's Dep't Stores, 455 F.3d 612, 623 (6th Cir. 2006). An employer may be liable for age discrimination, however, if it transfers some displaced employees but does not transfer another employee because of his or her age. Id. As part of establishing a prima facie case of age discrimination when a plaintiff is denied an opportunity to transfer, the plaintiff must produce evidence that "a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination." Id. Antunes has produced no such evidence to show that Defendants discriminated against him by not providing him with an alternative position.

Turning to the motion for summary judgment, the Court first discusses Antunes's alienage discrimination claim under § 1981 and national origin discrimination claim under ELCRA. It then discusses Antunes's age and sex discrimination claims under ELCRA. It finds that Antunes has not created a genuine factual dispute that Defendants discriminated against him on the basis of alienage, national origin, sex, or age and that Defendants are entitled to summary judgment on the § 1981 and ELCRA discrimination claims. And because the conspiracy claims are derivative of the underlying discrimination claims that Antunes fails to establish, Defendants are also entitled to summary judgment on the conspiracy claims. See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n., 670 NW2d 569, 580 (Mich. Ct. App. 2003).

## 1. Alienage Discrimination Under § 1981 and National Origin Discrimination Under ELCRA

Antunes alleges that Defendants discriminated against him on the basis of alienage, in violation of § 1981, and national origin, in violation of ELCRA.

As Defendants note, the Sixth Circuit has stated—though in unpublished opinions—that "[e]ven though Section 1981 does not use the word 'race,' the Supreme Court has held that it prohibits only racial discrimination." El-Zabet v. Nissan N. Am., Inc., 211 F. App'x 460, 462 (6th Cir. 2006). "That is, the statute relates solely to discrimination based on race and color," and "[n]ational origin discrimination is not within the scope of Section 1981." Salem v. City of Pontiac Sch. Dist., No. 81-1508, 1985 WL 12820, at *1 (6th Cir. Jan. 11, 1985) (noting that "§ 1981 has its origin in . . . the Civil Rights Act . . . which had as its primary purpose the eradication of the effects of slavery . . . [and therefore] relates solely to discrimination based on race and color"); see also O'Dell v. Kelly Servs., Inc., No. 15-cv-13511, 2017 WL 676945, at *9 (E.D. Mich. Feb. 21, 2017) (acknowledging that the Second Circuit has extended § 1981 to alienage discrimination but

following Sixth Circuit caselaw that did not do the same).  Based on this reasoning, alienage discrimination would also be beyond the reach of the statute.

However, even if alienage is a recognized basis for liability under § 1981, for the reasons stated below, Antunes has not offered any facts tending to show that alienage was the cause of his lack of promotion, the lack of increase in his compensation, or his termination.  For the same reasons, he has also not produced sufficient evidence to make out a prima facie case of national origin discrimination under ELCRA.

Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." Amini v. Oberlin Coll., 440 F.3d 350, 358 (6th Cir. 2006).  "The statute's protection extends to 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  Id. (quoting 42 U.S.C. § 1981(b)).  Under § 1981, "a plaintiff must . . . prove that, but for [the protected characteristic], [he or she] would not have suffered the loss of a legally protected right."  Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).  ELCRA states that employers shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  Mich. Comp. Laws § 37.2202(1)(a). Under ELCRA, a plaintiff must show that his or her national origin was "a motivating factor" in the employer's decision to take the adverse action.  See Hazle v. Ford Motor Co., 628 N.W.2d 515, 520, 522 (Mich. 2001); see also Patel v. Trinity Health Corp., No. 20-10517, 2021 WL 4894637, at *9 (E.D. Mich. Oct. 20, 2021) (noting that if a plaintiff cannot meet the "motivating factor" standard under ELCRA, he or she cannot show but-for causation for a § 1981 claim).

Section 1981 and ELCRA are analyzed under the same framework.  See Thompson v. City of Lansing, 410 F. App'x 922, 934 (6th Cir. 2011); Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999).  Under this framework, a plaintiff must either present direct evidence of discrimination or produce sufficient circumstantial evidence to allow an inference of discrimination.  Sniecinski v. Blue Cross & Blue Shield of Mich., 666 N.W.2d 186, 192 (Mich. 2003).  "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Thompson, 410 F. App'x at 929.  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003).

Antunes states that he has supplied direct evidence of alienage discrimination or national origin discrimination in statements by Karmol, the vice president group controller at Macsteel, and Marcucci, the president of Macsteel before Belloc, that Antunes's compensation and promotion eligibility should be determined by Gerdau S.A. because Antunes was a Brazilian expatriate.  Pl. Am. Resp. to Def. Mot. for Summary J. at 21–22.  But these statements would require the inference that Macsteel's denial of a promotion, its failure to increase Antunes's compensation, or its termination of Antunes was motivated at least in part by his citizenship status or his Brazilian national origin.  Therefore, these statements do not constitute direct evidence of discrimination.

Accordingly, Antunes must establish an inferential case of discrimination based on alienage or national origin by proceeding under the burden-shifting framework of McDonnell Douglas.  See Chambers v. City of Detroit, 786 F. Supp. 2d 1253, 1263 (E.D. Mich. 2011) (explaining that courts use the same burden-shifting analysis of McDonnell Douglas to analyze claims brought pursuant

24

to ELCRA and § 1981). First, the plaintiff must state a prima facie case of discrimination, which gives rise to a presumption of discrimination. Lytle v. Malady, 579 N.W.2d 906, 914–915 (Mich. 1998). The burden then shifts to the defendant to rebut the presumption by offering a "legitimate, nondiscriminatory reason" for the adverse action. Id. at 915. If the defendant does so, the plaintiff must show that there is a triable issue that the employer's reason is a mere pretext for discrimination. Id. at 916.

To establish a prima facie case of discrimination, a plaintiff must prove by a preponderance of the evidence that he or she (i) was a member of the protected class, (ii) suffered an adverse employment action, (iii) was qualified for the position, and (iv) suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). Circumstances give rise to an inference of discrimination if the employee "was treated differently than persons of a different class for the same or similar conduct." Singal v. Gen'l Motors Corp., 447 N.W.2d 152, 156 (Mich. Ct. App. 1989). Thus, the plaintiff must show that he or she was treated less favorably than a similarly situated individual outside the protected class. Hazle, 628 N.W.2d at 520.

Defendants argue that Antunes cannot establish the fourth element of a prima facie case. Def. Mot. for Summary J. at 20–23. In his response, Antunes states the following: "[the] evidence in the record discloses that he was treated differently than at least Ms. Blackwell with respect to compensation and promotion eligibility; that he was treated differently than Mr. Campomizzi with respect to the selection of Mr. Campomizzi for the OSC position and the concomitant termination of [Antunes's] employment relationships with Defendants and Gerdau S.A.; and that he also was effectively replaced by Mr. Campomizzi in the circumstances of this case." Pl. Am. Resp. to Def. Mot. for Summary J. at 23.

25

Simply referring to "evidence in the record" without pointing to specific evidence is insufficient, and the Court need not search the record to determine to which evidence Antunes refers.  See Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir. 2011).

Even considering the record regarding the treatment of Blackwell and Campomizzi, the evidence does not establish that Antunes was treated differently than similarly situated, non-protected employees.  Campomizzi is Brazilian, and the record does not indicate that he is a U.S. citizen, so he is a non-protected employee in regard to alienage or national origin.

Moreover, Antunes was terminated in a workforce reduction effort that included non-Brazilians.  And while Blackwell is a white U.S. citizen, she is not similarly situated to Antunes.  Antunes's primary contention seems to be that his salary was less than Blackwell's despite his more extensive job duties, and that he was denied salary increases and promotions when he assumed his additional responsibilities, while Blackwell received salary increases when she assumed her additional responsibilities.  See Pl. Am. Resp. to Def. Mot. for Summary J. at 6–8.  The Michigan Supreme Court has explained that "an employer's differing treatment of employees who were similar to the plaintiff in all relevant respects" except for the protected characteristic "can give rise to an inference of unlawful discrimination."  Hecht v. Nat'l Heritage Acads., 886 N.W.2d 135, 147 (Mich. 2016).  "[F]or this type of 'similarly situated' evidence alone to give rise to such an inference, however, . . . the comparable employees must be nearly identical to the plaintiff in all relevant respects."  Id. (punctuation modified); see also Town v. Mich. Bell Tel. Co., 568 N.W.2d 64, 70 (Mich. 1997) (explaining that, to create an inference of disparate treatment, a plaintiff must show that the plaintiff and a coworker "were similarly situated, i.e., all of the relevant aspects of [the plaintiff's] employment situation were nearly identical to those of [a coworker's] employment situation") (punctuation modified).

Here, Marcucci testified that Antunes and Blackwell held "completely different" responsibilities in their respective roles. Marcucci Dep. at 110. Specifically, the mill controller position, which Blackwell held, required "intimate knowledge of the steel-making process" to analyze the impact of costs on the process and budget deviations. Marcucci Dep. at 110–117. Mill controllers needed "detailed knowledge of how costs . . . evolve[d] throughout the entire process." Id. at 112. By contrast, Antunes did not have a firm understanding of where costs lie because he had never worked at a steel plant, and his accounting manager position did not require this detailed knowledge of the steel-making process. Id. at 111. While Antunes consolidated data related to budget deviations, unlike mill controllers, he did not determine the specific reasons for the deviations. Id. at 116. Marcucci stated that there was a "big difference" between Antunes's role at monthly meetings and controllers' roles. Antunes consolidated data and reported on it at monthly meetings by giving a high-level overview of profit and loss "with no specifics on the details." Id. at 113. But details were "what the controllers of the plants know intimately," and they "generated" "the real numbers of what happened." Id. at 113–114. Moreover, as a mill controller, Blackwell was solely responsible for the profitability of Macsteel's Monroe Mill. And as a regional controller, she oversaw the finances of all Macsteel mills, which comprised approximately 70 percent of Macsteel's profitability. Id. at 129; Blackwell Dep. at 25. The evidence does not reveal any similar oversight responsibilities held by Antunes.[11]  In addition,

---

[11] Antunes states that Karmol, the vice president group controller at Macsteel, confirmed in his deposition that the work Antunes performed as accounting manager was "at least equal" to the work that Blackwell performed as a controller and regional controller. Pl. Am. Resp. to Def. Mot. for Summary J. at 5 n.3. However, Karmol did not state in his deposition that Antunes's work was equal to Blackwell's work. Rather, while he confirmed that there may be some overlap between the skills and qualifications of accounting managers and controllers, he stated that Antunes did not spend enough time at the mills to be able to do the type of analysis that controllers were required to do. Karmol Dep. at 68.

Antunes reported to Belloc, while Blackwell reported to the company's vice president and general manager of the Monroe Mill.  Blackwell Dep. at 35; Antunes Dep. at 73.

Antunes also seemed to contend that he was treated differently in regard to pay and promotions than Jaclyn Anderson, a female U.S. citizen; Hinojosa, a male U.S. citizen; Adam Tabor, a male U.S. citizen; and Lisa Owen, a female U.S. citizen.  See Antunes Dep. at 226–230, 263; Macsteel Interr. Answers at 21–22 (Dkt. 29-21).  Defendants contend that none of these employees was similarly situated to Antunes.  Def. Mot. for Summary J. at 14, 21–23.  They note that Anderson was Antunes's subordinate and reported to him.  See Antunes Dep. at 65.  And Tabor and Owen had different job duties because they did not work in the financial department: Tabor was the vice president of order fulfillment and Owen worked in supply chain and production control.  See id. at 263; Def. Mot. for Summary J. at 7, 14 n.13.  In addition, Antunes testified that Hinojosa received a promotion when he threatened to leave Macsteel after the company hired a director of financial planning.  Id. at 233–236.  In contrast, Antunes responded to the hiring decision by requesting that he be hired for another position in internal auditing at Ameristeel.  Id.  Antunes does not offer evidence rebutting Defendants' contention that these employees were not similarly situated—or respond to Defendants' contention that they were not.  Therefore, he cannot rely on their treatment to establish a prima facie case of alienage or national origin discrimination.

Moreover, other grounds on which Antunes alleges discrimination are insufficient.  In his deposition, Antunes asserted that he was discriminated against on the basis of alienage and/or national origin because of various actions by Karmol, including that: Karmol did not discuss promotions with him; Karmol told Antunes that Hinojosa was Karmol's "natural successor"; and once, "a long time ago," Karmol referred to Brazilians as "spies."  Antunes Dep. at 226–230.  Defendants argue that none of these actions create an inference of unlawful discrimination.  Def.

28

Mot. for Summary J. at 21.  Antunes does not respond to these arguments, and these actions are insufficient to establish a prima facie case.  Antunes does not offer evidence that Karmol did discuss promotions with similarly situated, non-Brazilian, non-U.S.-citizen employees.  As Defendants note, Hinojosa did not replace Karmol.  And Karmol's isolated past remark does not constitute direct evidence of discrimination.  See White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 239 (6th Cir. 2005) (explaining that "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination").  It also does not give rise to an inference of alienage or national origin discrimination, as Antunes presented no evidence indicating a causal connection between Karmol's statement and any adverse employment action.  See Hussain v. Highgate Hotels, Inc., 126 F. App'x 256, 265 (6th Cir. 2005) (finding that, when there is no evidence that a supervisor acted on a disposition to discriminate against people of a national origin in discharging an employee, a supervisor's statement does not give rise to an inference of discrimination).

Antunes has not created a genuine factual dispute that he was discriminated against on the basis of alienage or national origin in lack of promotion, compensation, or termination.  Therefore, Defendants are entitled to summary judgment on his § 1981 claim and his ELCRA claim based on national origin discrimination.

## 2.   Sex Discrimination Under ELCRA

Antunes does not present direct evidence of sex discrimination.  See Pl. Am. Resp. to Def. Mot. for Summary J.; Antunes Dep. at 271 (stating that no one made comments to Antunes about his sex).  Therefore, he must present sufficient circumstantial evidence to allow an inference of sex discrimination.  He has not done so.  Antunes asserts that he was treated differently than Blackwell regarding pay and promotions.  Pl. Am. Resp. to Def. Mot. for Summary J. at 6–8, 23.  As noted above, however, Blackwell is not similarly situated to Antunes.  In his deposition,

Antunes identified other female employees whom he stated were treated differently regarding pay and promotions, including Anderson, Owens, and Diane Worthing.   Antunes Dep. at 268. Defendants argue that none of these employees is similarly situated to Antunes because they had different positions and job duties.   In his response, Antunes does not refer to any of these employees and, instead, uses only Blackwell as a comparator.   Even considering these employees, Anderson and Owens are not similarly situated to Antunes for the reasons stated above, and Worthing is not similarly situated because she reported to Antunes.  Antunes Dep. at 357.   Antunes cannot satisfy the fourth element of a prima facie case, and Defendants are entitled to summary judgment on Antunes's sex discrimination claim.

### 3.   Age Discrimination Under ELCRA

Antunes alleges that Defendants treated him differently regarding compensation and promotion eligibility, terminated him, replaced him with Campomizzi, and did not select him for the OSC position, all due to his age.  Pl. Am. Resp. to Def. Mot. for Summary J. at 22–23.

Antunes points to two pieces of evidence that he states are direct evidence of age discrimination: the notes that Belloc took during interviews for the OSC position, which report the ages of some candidates, and testimony about an "age-based pipeline."  Pl. Am. Resp. to Def. Mot. for Summary J. at 13 n.10, 22.   Neither constitutes direct evidence of discrimination.   Belloc's notes would require an inference that he and other Macsteel employees did in fact consider candidates' ages in selecting an OSC and that the decision to select Campomizzi, rather than Antunes, for the OSC position was motivated at least in part by Antunes's age.   Antunes described the "age-based pipeline" as the following: the OSC would be trained over several years to replace the CFO of Gerdau S.A. in Brazil, but Gerdau requires employees to retire at the age of 60. Antunes Dep. at 132.  He concluded that, because he would be about 60 years old by the time the

CFO position becomes available, he was ineligible for the OSC role.  Id.  But this testimony about the future plans for the OSC role does not "compel[ ] the conclusion that unlawful discrimination was at least a motivating factor" in not selecting Antunes for the position or in terminating him. Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013).

Therefore, Antunes must rely on circumstantial evidence and first make out a prima facie case. To establish a prima facie case of age discrimination, a plaintiff must show that he or she (i) was a member of a protected age class; (ii) was subjected to an adverse employment action; (iii) was otherwise qualified for the position; and (iv) was replaced by a younger worker or, alternatively, treated less favorably than similarly situated, non-protected employees.  Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 317 (6th Cir. 2007); see also Featherly v. Teledyne Indus., Inc., 486 N.W.2d 361, 364 (Mich. Ct. App. 1992) (noting that Michigan courts consider federal law when reviewing claims of age discrimination based on state law).

As with Antunes's other discrimination claims, Defendants challenge solely the fourth element.  They argue that Antunes cannot satisfy the fourth element because there is no evidence that Antunes was replaced by a younger individual or treated differently because of his age.  Def. Mot. for Summary J. at 13.  The Court first discusses the allegations regarding compensation and promotion eligibility.  It next examines the claim that Macsteel terminated Antunes and replaced him with Campomizzi due to his age.  It then addresses the claim that Macsteel did not select him for the OSC position due to his age.

### a. Compensation and Promotion Eligibility

In his response, the only individual whom Antunes offers as a comparator regarding compensation and promotion eligibility is Blackwell.  See Pl. Am. Resp. to Def. Mot. for Summary J. at 6–8, 22–23.  But Blackwell was in her fifties at the time of the alleged discriminatory events.

Blackwell Dep. at 10. Because she is not outside the protected class, Antunes cannot rely on her compensation or promotion eligibility to establish the fourth element of a prima facie case of age discrimination. See Tuttle, 474 F.3d at 317.

In his deposition, Antunes stated that he was treated differently than other Macsteel employees, including Hinojosa, Tabor, Owens, Anderson, and Worthing. But Hinojosa is not outside the protected class because he was in his fifties at the time of the alleged events, see Hinojosa Dep. at 104, and Defendants contend that none of these employees were similarly situated. Antunes does not offer evidence to rebut this contention. Def. Mot. for Summary J. at 14. Therefore, a reasonable jury could not find that he was denied compensation or promotion due to his age.

**b. Termination and Replacement**

Antunes alleges that Defendants discriminated against him based on his age by terminating him and replacing him with Campomizzi. Pl. Am. Resp. to Def. Mot. for Summary J. at 23. Macsteel terminated Antunes and two other employees as part of what Macsteel identifies as a workforce reduction effort. Belloc Dep. at 138; Tabor Aff. ¶ 21.

When an employer eliminates an employee's position pursuant to a reduction in force or a reorganization, "the fourth prong [of a prima facie case] is modified so that the plaintiffs must provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 547 (6th Cir. 2004) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)); see also Sahadi v. Reynolds Chem., 636 F.2d 1116, 1117 (6th Cir. 1980) (noting that, when it is shown that an employer is making cutbacks due to economic necessity, a plaintiff cannot make out a prima facie case of age discrimination by merely showing that they were a competent employee and that they were terminated).

The Sixth Circuit has explained that a workforce reduction occurs "when business considerations cause an employer to eliminate one or more positions within the company." Barnes v. GenCorp. Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).  "An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge."  Id.  In turn, an employee is replaced "only when another employee is hired or reassigned to perform the plaintiff's duties."  Id.  By contrast, an employee is not replaced when another employee is assigned to perform his or her duties in addition to other duties or when the work is redistributed among other existing employees who already perform related work.  Id.

Antunes does not set forth direct or statistical evidence that tends to indicate that Macsteel singled him out for discharge for impermissible reasons.  He has also not created through circumstantial evidence a triable issue that he was replaced by Campomizzi or terminated due to his age.  He asserts that Defendants replaced him with Campomizzi because the OSC position was simply his accounting manager position with a different title.  See Antunes Dep. at 133–134. Antunes's testimony indicates that there may have been some overlap between the duties that Antunes stated that he performed in his role as an account manager and the duties for the OSC role.  Antunes Dep. at 133–142.  For instance, when asked if he was "already fulfilling all of the job functions that are in the [OSC] position," Antunes responded, "I was doing or capable of doing [them].  I was qualified for sure.  All the qualifications, yes."  Id. at 134.  He then looked to the OSC job description, which listed 17 duties, and testified that he was not performing at least five of those duties.  Id. at 133–142.  Evidence of some job overlap does not indicate that an employee was replaced.  See Barnes, 896 F.2d at 1474 (finding that the fact that employees performed related or overlapping work did not show that the plaintiff was replaced).

33

Further, Macsteel employees stated that Antunes was not replaced by Campomizzi, but, rather, his position was eliminated, and his job duties were distributed among current employees. According to Tabor, Macsteel's vice president, Macsteel eliminated Antunes's position and distributed his job duties among current employees.   Tabor Aff. ¶¶ 19–20.  Belloc testified that he and other Macsteel leadership eliminated Antunes's position due to the company's need to restructure the business, and, instead of replacing him, they discontinued some of his job duties and delegated the remaining ones among at least three other employees.  Belloc Dep. at 137–140. Hinojosa testified that Antunes's job duties were divided between him and two other employees. Hinojosa Dep. at 111.  And Marcucci testified that he considered eliminating Antunes's position and redistributing his job duties elsewhere several times.  Marcucci Dep. at 160–161.

In addition, Antunes states that he was terminated even though he was qualified for the accounting manager position, which was "later filled by a younger, female U.S. citizen who was not of Brazilian national origin."  Pl. Am. Resp. to Def. Mot. for Summary J. at 14.  But, for this proposition, he cites his own affidavit and the testimony of Blackwell and Brandie Boucher, a Macsteel employee.  Blackwell and Boucher testified that Macsteel hired a plant accountant in December 2019.  Blackwell Dep. at 63–64; Boucher Dep. at 124.  Antunes does not offer evidence indicating that a plant accountant did the same job as his former position of accounting manager. And his subjective beliefs about his qualifications are insufficient to establish a prima facie case. See Hazle, 628 N.W.2d at 528.

Moreover, Antunes was terminated alongside a 23-year-old and a 24-year-old employee. Antunes argues that those individuals were employed in lower-level positions in Fort Smith and that Antunes's was the only position eliminated in the Jackson facility.  Pl. Am. Resp. to Def. Mot. for Summary J. at 14 n.11.  But both facilities are Macsteel facilities, and Belloc testified that

Macsteel restructured the entire business, not just the Jackson facility or positions on Antunes's level.  Belloc Dep. at 137–140.

Accordingly, Antunes has not created a genuine factual dispute that he was replaced by a younger employee or terminated due to his age.  See Sahadi, 636 F.2d at 1117 (affirming the district court's finding that a jury could not reasonably conclude that age discrimination occurred because "[the] plaintiff's job was simply eliminated . . .  not replaced; his former duties were assumed by [another employee], who performed them in addition to his other functions").

### c. Failure to Promote/Hire for the OSC Position

Antunes also alleges that Defendants discriminated against him on the basis of age by selecting Campomizzi for the OSC position, rather than him.  Pl. Am. Resp. to Def. Mot. for Summary J. at 23.

### 1. Prima Facie Case

To state a prima facie case of discrimination in failure to promote or hire under ELCRA, a plaintiff must show that (i) he or she was a member of a protected class; (ii) he or she suffered an adverse employment action; (iii) he or she was qualified for the position; and (iv) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. Hazle, 628 N.W.2d at 521.  The Michigan Supreme Court has explained that while a plaintiff is not required to provide evidence that he or she was at least as qualified as the successful candidate, evidence of relative qualifications satisfies the fourth element of the prima facie burden.  Id.

There seems to be no dispute that (i) Antunes was 51 years old at the time he was not selected for the OSC position; (ii) he applied and was qualified for the OSC position; and (iii) Campomizzi, the selected candidate, was 30 years old—about 20 years younger than Antunes.  Instead,

Defendants focus on the fourth element of a prima facie case, arguing that Campomizzi was "significantly more qualified" than Antunes. Def. Mot. for Summary J. at 15.

Antunes has satisfied his minimal burden at the prima facie stage. Antunes and Campomizzi were both offered an interview for the OSC position. Courts have found circumstances in which two candidates were offered an interview sufficient to create a genuine issue of material fact regarding whether they had relatively similar qualifications, which can satisfy the fourth element of a prima facie case. See Dale v. City of Paris, No. 5:20-324-DCR, 2022 WL 141602, at *15 (E.D. Ky. Jan. 10, 2022); Meyrose v. Vitas Hospice Servs., LLC, No. 19-91-DLB-CJS, 2021 WL 5139478, at *10 (E.D. Ky. Nov. 3, 2021).

### 2. Legitimate, Nondiscriminatory Reason for the Adverse Employment Action

To rebut the presumption of discrimination that arises when a plaintiff has sufficiently established a prima facie case, the defendant must offer a "legitimate, nondiscriminatory reason" for the adverse employment action. Lytle, 579 N.W.2d at 914–915. The defendant "need not persuade the court that it was actually motivated by the proffered reasons." Id. Rather, it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. Id. at 915.

Defendants state that they did not hire Antunes for the OSC position because Campomizzi was significantly more qualified than Antunes and the other applicants. Def. Mot. for Summary J. at 18. They assert that Rodrigues and Belloc were particularly focused on candidates' work experience when evaluating them for the position, and Campomizzi had more experience as a controller than Antunes, who had never been a controller. Id. They also emphasize that during his interview, Antunes primarily discussed issues he had with Macsteel and then asked if he was going to be fired. Id. at 18–19. And they state that Antunes did not respond to Belloc's request

for ideas on how Macsteel could reduce costs and increase profitability.  Id. at 19.  According to

Defendants, Antunes had not demonstrated that he could conduct the financial analysis that

Macsteel needed.  Id.  Defendants' reasons satisfy their burden of proof at this stage.  See Pucci v.

Basf Corp., 55 F. App'x 243, 245 (6th Cir. 2002) (finding superior qualifications of the selected

candidate to be acceptable reason); Flowers v. WestRock Servs., Inc., 979 F.3d 1127, 1133 (6th

Cir. 2020) (finding sufficient reason where "would-be supervisors thought poorly of [the

plaintiff's] work ethic . . . from their personal experience"); Plegue v. Clear Channel Broad., Inc.,

No. 04-CV-74348-DT, 2005 WL 3133508, at *10 (E.D. Mich. Nov. 22, 2005) (finding that

defendant provided legitimate, nondiscriminatory reason for failure to hire when it stated that

plaintiff gave unsatisfactory answers during an interview and that another candidate was more

qualified).

### 3.  Pretext

Once the defendant produces evidence of a legitimate, nondiscriminatory reason for the

adverse employment action, the burden shifts back to the plaintiff to raise a triable issue that the

employer's reasons were not just false but, rather, a pretext for unlawful discrimination.  Lytle,

579 N.W.2d at 915; see also Town v. Mich. Bell Tel. Co., 568 N.W.2d 64, 68 (Mich. 1997)

(explaining that merely disproving an employer's nondiscriminatory reason is insufficient to

survive summary judgment unless the plaintiff raises a triable question of discriminatory motive,

not mere falsity).

To raise a genuine issue of fact as to pretext and defeat a summary judgment motion, a plaintiff

must show one of the following: "(1) that the proffered reason[ ] had no basis in fact, (2) that the

proffered reason[ ] did not actually motivate the action, or (3) that the proffered reason[ was]

insufficient to motivate the action." <u>Cicero v. Borg-Warner Automotive, Inc.</u>, 280 F.3d 579, 589 (6th Cir. 2002) (punctuation modified).

Antunes argues that Defendants' reasons for selecting Campomizzi "had no basis in fact, did not actually motivate the adverse treatment, or were insufficient to justify the adverse treatment" in part because Campomizzi lacked the required qualifications for the OSC position. Pl. Am. Resp. to Def. Mot. for Summary J. at 24–25. Antunes's assertion relies on the relative qualifications of himself and Campomizzi.

"Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.'" <u>Bartlett v. Gates</u>, 421 F. App'x 485, 490–491 (6th Cir. 2010) (quoting <u>Bender</u>, 455 F.3d at 627–628); <u>see also</u> <u>Bender</u>, 455 F.3d at 626–627 (explaining that when the plaintiff offers "other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment").

The first scenario does not apply here, as the evidence does not show that Antunes was a plainly superior candidate such that no reasonable employer would have chosen Campomizzi over him. Rodrigues and Belloc testified that, in hiring for the OSC position, they valued work experience as a controller, which Campomizzi had and which Antunes lacked.

Thus, Antunes must rely on the second scenario. Some evidence indicates that Antunes was as qualified as Campomizzi. The OSC job position required a bachelor's degree in accounting or finance, which Antunes had and which Campomizzi lacked. It also stated that an MBA, which

Antunes had and which Campomizzi lacked, was preferred.  Antunes had more years of work experience performing financial work for a manufacturing organization, and he testified that he was already performing some of the OSC duties.  "However, even assuming equal qualifications, [Antunes] must also show other probative evidence of discrimination."  Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 817 (6th Cir. 2011) (punctuation modified); see also Bender, 455 F.3d at 627 ("[E]vidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.").

Cases that have addressed "other probative evidence of discrimination" in the context of failure to promote have identified facially discriminatory remarks, id.; multiple pieces of evidence that suggested a "discriminatory atmosphere" in the workplace, Rachells v. Cingular Wireless Empl. Servs., LLC, 732 F.3d 652, 669 (6th Cir. 2013); "degrading comments regarding the capabilities" of individuals in the protected class, Risch v. Royal Oak Police Dep't, 581 F.3d 383, 390 (6th Cir. 2009); and "some evidence of irregularities in the application and selection process, inconsistencies in the reasons given by [the employer] for not hiring [the plaintiff], and the lack of members of the same protected class in supervisory positions at [the employer]," Jenkins v. Nashville Pub. Radio, 106 F. App'x 991, 995 (6th Cir. 2004).

Antunes does not offer any of these types of evidence or evidence that otherwise creates a genuine factual dispute that Defendants' failure to offer him the OSC position was a pretext for age discrimination.  The evidence of pretext that Antunes points to includes the following:

1. "The evidence which supports [Antunes's] prima facie cases of discrimination."
2. Belloc "decided not to select [Antunes] for the OSC position and to select Campomizzi consistent with the age-based 'pipeline.'"
3. Belloc "concocted a scheme to cover up these acts of discrimination after he had notice of [Antunes's] claims.
4. Antunes was the only employee to have his job eliminated in the Jackson office.

5. Macsteel did not save costs by eliminating Antunes's job because the higher-paying OSC position replaced it, and Macsteel created another higher-paying job.
6. Antunes was not offered a position as a plant accountant.

Pl. Am. Resp. to Def. Mot. for Summary J. at 25–26.

Antunes does not specify which evidence that supports his prima facie case shows that pretext is a genuine factual dispute, and he has made a prima facie case only for his failure-to-promote claim. But the fact that he and Campomizzi were both offered an interview or had similar qualifications does not alone suffice to show that Defendants' reason had no basis in fact, did not actually motivate Defendants' decision not to select Antunes for the OSC position, or was insufficient to justify the decision.[12] See Bartlett, 421 F. App'x at 491.

Regarding the "age-based pipeline," Antunes testified that Rodrigues told him that the OSC candidate would be part of the Gerdau "pipeline" for succession planning, in which the candidate would be expected to replace the financial leader in Tampa, Florida and then replace Gerdau S.A.'s CFO in Brazil. Antunes Dep. at 132–133. Both Antunes and Hinojosa testified that Gerdau S.A. did not hire or retain employees over the age of 60. Antunes Dep. at 132–133; Hinojosa Dep. at 109–110. From this, Antunes concludes that, if the OSC candidate were intended to replace Gerdau S.A.'s CFO over a period of several years, and Gerdau S.A. did not hire or retain employees over the age of 60, then his age must have been a factor in Defendants' decision, as he

---

[12] In his response, Antunes states that he and Hinojosa received emails in October and November 2019 that revealed that Macsteel included in its 2020 budget the cost of hiring an expatriate controller. Pl. Am. Resp. to Def. Mot. for Summary J. at 10. He contends that this email constitutes proof that Macsteel already intended to hire a younger employee for the OSC position. Id. But Antunes does not explain why including in the 2020 budget the cost of hiring an expatriate controller necessarily indicates that Macsteel intended to hire a younger employee or hire that employee for the OSC position—and he does not develop an argument as to why this evidence shows pretext.

was in his fifties at the time he applied for the position.[13]  But Antunes's conclusion represents speculation and "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination," which is insufficient.  Peters v. Lincoln Elec. Co., 285 F.3d 456, 470 (6th Cir. 2002) (punctuation modified).

In addition, Antunes does not set forth evidence in support of his statement that Belloc "concocted a scheme" to conceal Belloc's allegedly discriminatory actions after Belloc had notice of Antunes's claims.  And, as noted above, while Antunes was the only individual whose position was eliminated in the Jackson facility, two younger employees in another Macsteel facility had their positions eliminated—and Belloc testified that Macsteel restructured the entire business, not just the Jackson facility or positions on Antunes's level.  Belloc Dep. at 137–140.  Further, even if Macsteel created two jobs that paid more than Antunes's former job, this does not establish that Macsteel did not save costs as part of this workforce reduction effort—or constitute evidence that the reasons Macsteel provided for terminating Antunes were not merely false but also were a pretext for age discrimination.  And, as discussed above, Antunes does not explain whether the plant accountant position was similar to the accounting manager position that he held such that not offering it to him would be relevant to determining pretext.  To the extent Antunes intends to argue that Defendants discriminated against him on the basis of age by not offering him the plant accountant position, he must produce evidence that "a similarly-situated employee who is not a

---

[13] Antunes states that Hinojosa's deposition supports that there was an "age-based pipeline."  But when Hinojosa was asked if anyone told him that the OSC position "was deemed to be a pipeline to groom younger Brazilian expats or younger people in general to learn the skills and responsibilities associated with that position in advance of being transferred to Ameristeel and ultimately to Gerdau S.A. to replace leadership at Gerdau S.A.," he responded: "That's not correct. I wouldn't say it was young . . .  But it was mentioned that the position was a pipeline to, you know, potential advancement to Gerdau Ameristeel or GLN and maybe ultimately to Gerdau S.A." Hinojosa Dep. at 108.

member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination." Bender, 455 F.3d at 623.  Antunes has produced no such evidence.

Therefore, Antunes has not created a triable issue that the reason Defendants offer for selecting Campomizzi for the OSC position is a pretext for age discrimination.  Defendants are entitled to summary judgment on Antunes's age discrimination claim.

### D. EPA Claim

Antunes alleges that Defendants violated the EPA because they paid Blackwell substantially more than him even though they had the same pay grade and Antunes had more extensive job duties and responsibilities.  Pl. Am. Resp. to Def. Mot. for Summary J. at 28.

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work.  29 U.S.C. § 206(d)(1).  "Equal work" does not require that the jobs be identical.  Odomes v. Nucare, Inc., 653 F.2d 246, 250 (6th Cir. 1981). Rather, to establish a prima facie case of wage discrimination, the plaintiff must show that the jobs "require equal skill, effort, and responsibility" and "are performed under similar working conditions."  Birch v. Cuyahoga Cnty. Prob. Ct., 392 F.3d 151, 161 (6th Cir. 2004) (punctuation modified).  The determination of whether two employees' jobs are substantially similar involves "an overall comparison of the work, not its individual segments."  Odomes, 653 F.2d at 250.  Once a plaintiff has established that he or she has been paid unequally for equal work, "the burden shifts to the employer to show that the differential is justified under one of the Act's four exemptions." Corning Glass Works v. Brennan, 417 U.S. 188, 196 (1974).  These exceptions are: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.  Id.

Defendants contend that Antunes cannot make out a prima facie case of wage discrimination because his role did not require the same level of skill, effort, responsibility, or working conditions as Blackwell's role.  Def. Mot. for Summary J. at 25–27.  Antunes responds by stating that "[t]he evidence which supports Plaintiff's prima facie case discloses that Ms. Blackwell was paid substantially more than Plaintiff although they had the same pay grade and he had far more extensive job duties and responsibilities than her."  He offers no additional specificity.

For the same reasons stated in regard to Antunes's national origin and sex discrimination claim—that Blackwell's job as mill controller and regional controller involved different skills, effort, and responsibility than Antunes's role as accounting manager—Antunes cannot establish a prima facie case of wage discrimination.  He has not met his burden of showing that his job and Blackwell's job were substantially equal.  See Korte v. Diemer, 909 F.2d 954, 959 (6th Cir. 1990) ("A finding of 'sex discrimination in compensation' under [Title VII or the EPA] is tantamount to a finding of 'pay discrimination on the basis of sex' under the other [statute]. Conduct that a jury finds to be 'based on' sex, and not motivated by nondiscriminatory reasons, cannot later be found by a district court to lack an intent to discriminate on the basis of sex."); In re Rodriguez, 487 F.3d 1001, 1007 (6th Cir. 2007) (explaining that cases brought pursuant to ELCRA are analyzed under the same evidentiary framework used in Title VII cases); Perkins v. Rock-Tenn Servs., Inc., 190 F. Supp. 3d 720, 730 (W.D. Mich. 2016) ("To the extent Plaintiff asserts a claim of wage discrimination in violation of the ELCRA, her claim fails for the same reasons that her EPA and Title VII claim fail.").  Therefore, Defendants are entitled to summary judgment on Antunes's EPA claim to the extent it is based on Macsteel's actions.

Moreover, Antunes cannot prevail on his claim to the extent it is based on the actions of Ameristeel or Belloc.  An individual employee or supervisor who does not otherwise qualify as an

"employer," such as Belloc, may not be held personally liable under the EPA.  Rose v. G.UB.MK

Constructors, No. 98-5755, 1999 WL 507025, at *2 (6th Cir. 1999).   And the alleged

discrimination occurred after Antunes stopped working at Ameristeel.

### E. Tortious Interference Claims

Defendants argue that Antunes's tortious interference with an employment contract claim fails

because he testified that he did not have a written employment contract and has not offered any

evidence to show that he had an implied contract.  Def. Mot. for Summary J. at 27–29.  They also

argue that Antunes's tortious interference with a business relationship or expectancy claim fails

because he has not offered any evidence of illegal, unethical, or fraudulent conduct.  Id. at 29–30.

In his response, Antunes offers only a conclusory statement that Defendants are not entitled to

summary judgment on these claims.[14]  This defense is insufficient to survive summary judgment

for either tortious interference claim, and, as noted above, Antunes has not overcome the

presumption that he was an at will employee.   Therefore, Defendants are entitled to summary

judgment on Antunes's tortious interference with a contract claim and his tortious interference

with a business relationship or expectancy claim.

### III. CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendants' motion

to strike (Dkt. 37).  The Court denies the request to strike Antunes's counter-statement of material

facts and Antunes's response in its entirety.  The Court grants in part the request to strike Antunes's

---

[14] Antunes simply states that genuine issues of fact remain because Belloc's "discrimination and interference against [Antunes] based on his age with respect to the selection of Mr. Campomizzi for the OSC position and the concomitant termination of [Antunes's] employment relationships with Defendants and Gerdau S.A. evinces that [Belloc] acted outside the scope of [Belloc's] authority by doing an act that is per se wrongful and that is unjustified in law for the purpose of invading the contractual rights or business relationship of [Antunes]."  Pl. Am. Resp. to Def. Mot. for Summary J. at 28–29.

affidavit, striking all paragraphs of the affidavit except paragraphs 3 and 6–8.  It denies as moot the request to strike exhibits attached to the affidavit, and it denies the request for attorney fees.  The Court denies Antunes's motion for partial summary judgment (Dkt. 28) and grants Defendants' motion for summary judgment (Dkt. 29).  Finally, the Court denies as moot the parties' joint motion to extend trial-related dates (Dkt. 48).

SO ORDERED.

Dated: August 24, 2022                                  s/Mark A. Goldsmith
        Detroit, Michigan                               MARK A. GOLDSMITH
                                                        United States District Judge